**Slip Op. 09-39**

UNITED STATES COURT OF INTERNATIONAL TRADE

---

ZHENGZHOU HARMONI SPICE CO., LTD., :
JINAN YIPIN CORPORATION, LTD., JINING
TRANS-HIGH TRADING CO., LTD., JINXIANG :
SHANYANG FREEZING STORAGE CO., LTD.,
LINSHU DADING PRIVATE AGRICULTURAL :
PRODUCTS CO., LTD., SHANGHAI LJ
INTERNATIONAL TRADING CO., LTD., and :
SUNNY IMPORT AND EXPORT LTD.,

               :

               *Plaintiffs*,

               :

       v.

               :          Court No. 06-00189

UNITED STATES,

               :

               *Defendant*,

               :

           and

               :

FRESH GARLIC PRODUCERS ASSOCIATION,
CHRISTOPHER RANCH, L.L.C., THE :
GARLIC COMPANY, VALLEY GARLIC,
and VESSEY AND COMPANY, INC., :

               *Defendant-Intervenors*. :

---

[Granting in part Plaintiffs' Motion for Judgment on the Agency Record, and remanding action to U.S. Department of Commerce.]

Dated: May 13, 2009

       Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP (Bruce M. Mitchell, Mark E. Pardo, Paul G. Figueroa, and William F. Marshall), for Plaintiffs Zhengzhou Harmoni Spice Co., Ltd., Jinan Yipin Corporation, Ltd., Linshu Dading Private Agricultural Products Co., Ltd., and Sunny Import & Export Co., Ltd.

       Michael F. Hertz, Deputy Assistant Attorney General; Jeanne E. Davidson, Director, and Patricia M. McCarthy, Assistant Director, Commercial Litigation Branch, Civil Division U.S. Department of Justice (Mark T. Pittman and David S. Silverbrand); Scott D. McBride, Office of the

Chief Counsel for Import Administration, U.S. Department of Commerce, Of Counsel; for Defendant.

    Kelley Drye Collier Shannon (Michael J. Coursey and Michael R. Kershow), for Defendant-Intervenors.

## OPINION

RIDGWAY, Judge:

    In this action, Plaintiffs Zhengzhou Harmoni Spice Co., Ltd., Jinan Yipin Corporation, Ltd., Jining Trans-High Trading Co., Ltd., Jinxiang Shanyang Freezing Storage Co., Ltd., Linshu Dading Private Agricultural Products Co., Ltd., Shanghai LJ International Trading Co., Ltd., and Sunny Import & Export Co., Ltd. – Chinese producers and exporters of fresh garlic – contest the final results of the U.S. Department of Commerce's tenth administrative review of the antidumping duty order covering fresh garlic from the People's Republic of China ("PRC"). *See* Fresh Garlic from the People's Republic of China: Final Results and Partial Rescission of Antidumping Duty Administrative Review and Final Results of New Shipper Review, 71 Fed. Reg. 26,329 (May 4, 2006) ("Final Results"); Issues and Decision Memorandum for the Administrative Review and New Shipper Reviews of the Antidumping Duty Order on Fresh Garlic from the People's Republic of China (April 26, 2006) (Pub. Doc. No. 462) ("Decision Memorandum").[1]

    Pending before the Court is the Motion for Judgment on the Agency Record filed on behalf

---

[1]Because the administrative record in this action includes confidential information, two versions of that record were filed with the Court. Citations to documents in the public record are noted as "Pub. Doc. No. ____," while citations to documents in the confidential record are noted as "Conf. Doc. No. ____." The public version of the administrative record consists of copies of all documents in the record, with all confidential information redacted. The confidential version of the record consists of complete, un-redacted copies of only those documents that include confidential information.

of four of the plaintiffs in this matter – Zhengzhou Harmoni Spice Co., Ltd., Jinan Yipin

Corporation, Ltd., Linshu Dading Private Agricultural Products Co., Ltd., and Sunny Import &

Export Co., Ltd. (collectively "the Chinese Producers").[2]  In their motion, the Chinese Producers

challenge the methodology used in calculating "normal value," as well as various other aspects of

Commerce's antidumping determination, and request that this matter be remanded to the agency for

reconsideration. *See generally* Brief in Support of Plaintiffs' Rule 56.2 Motion for Judgment on the

Agency Record ("Pls.' Brief"); Reply Brief in Support of Plaintiffs' Rule 56.2 Motion for Judgment

on the Agency Record ("Pls.' Reply Brief").[3]

The Government opposes the Chinese Producers' motion.  The Government maintains that

Commerce's determination is supported by substantial evidence and is otherwise in accordance with

---

[2]Although the Complaint in this action was filed on behalf of seven plaintiffs, the pending Motion for Judgment on the Agency Record was filed only by the four plaintiffs specifically identified above.  The other three plaintiffs took no part in briefing or oral argument, and have expressed no views on the issues addressed herein.

As noted above, the four movant plaintiffs are referred to herein, collectively, as "the Chinese Producers."  Other garlic producers from the PRC who were involved in Commerce's administrative review, including the three non-movant plaintiffs, are generally referred to simply as "respondents."

[3]"Normal value" is generally "the price at which the foreign like product is first sold [or offered for sale] for consumption in the exporting country."  19 U.S.C. § 1677b(a)(1) (2000).  A "foreign like product" is generally merchandise that is identical to or like the subject merchandise made by the same foreign producer in the same foreign country.  *See* 19 U.S.C. § 1677(16) (2000).

Dumping takes place when goods are imported into the U.S. and sold at a price lower than their normal value. 19 U.S.C. §§ 1673, 1677(34) (2000).  Under antidumping law, an antidumping duty is based on the "dumping margin" – the amount by which the normal value of the imported subject merchandise exceeds the "export price" or the "constructed export price" of the subject merchandise. 19 U.S.C. §§ 1673, 1677(35) (2000).  Export Price and Constructed Export Price refer to Commerce's two methods for calculating prices for merchandise imported into the United States. *See* 19 U.S.C. §§ 1677a(a)-(b) (2000).

law, and that it should be sustained in all respects. *See generally* Defendant's Memorandum in

Opposition to Plaintiffs' Rule 56.2 Motion for Judgment Upon the Agency Record ("Def.'s Brief").

The Defendant-Intervenors, representing the interests of domestic producers of fresh garlic,

oppose the Chinese Producers' motion as to two of the seven issues raised – *i.e.*, Commerce's use

of the agency's intermediate input methodology and the valuation of garlic bulb – and, like the

Government, similarly urge that Commerce's determination should be sustained. *See generally*

Defendant-Intervenors' Brief in Response to Plaintiffs' Motion for Judgment on the Administrative

Record ("Def.-Ints.' Brief").[4]

Jurisdiction lies under 28 U.S.C. § 1581(c) (2000).[5] For the reasons set forth below, the

Chinese Producers' Motion for Judgment on the Agency Record is granted in part.

## I. Background

The underlying antidumping order here at issue, covering imports of fresh garlic from the

PRC, dates back to 1994. *See* Antidumping Duty Order: Fresh Garlic from the People's Republic

of China, 59 Fed. Reg. 59,209 (Nov. 16, 1994) ("Antidumping Order").[6] In December 2004,

---

[4]The Domestic Producers are the Fresh Garlic Producers Association and its individual members, Christopher Ranch, L.L.C., The Garlic Company, Valley Garlic, and Vessey and Company, Inc.

[5]All citations to statutes herein are to the 2000 edition of the United States Code. Similarly, all references to regulations are to the 2003 edition of the Code of Federal Regulations.

[6]The merchandise subject to the Antidumping Order includes "all grades of garlic, whole or separated into constituent cloves, whether or not peeled, fresh, chilled, frozen, provisionally preserved, or packed in water or other neutral substance, but not prepared or preserved by the addition of other ingredients or heat processing," which "is used principally as a food product and for seasoning." Antidumping Order, 59 Fed. Reg. at 59,209.

Commerce initiated its tenth administrative review of producers and exporters of fresh garlic from the PRC, including the Chinese Producers who are the plaintiffs in this action. *See* Initiation of Antidumping and Countervailing Duty Administrative Reviews and Request for Revocation in Part, 69 Fed. Reg. 77,181 (Dec. 27, 2004); *see also* Fresh Garlic from the People's Republic of China: Preliminary Results and Partial Rescission of Antidumping Duty Administrative Review and Preliminary Results of New Shipper Reviews, 70 Fed. Reg. 69,942, 69,942-43 (Nov. 18, 2005) ("Preliminary Results").[7]

In the course of conducting the administrative review, Commerce issued multiple questionnaires to the respondents (*i.e.*, various Chinese garlic producers, including Plaintiffs), requesting information concerning their organization, sales, and production costs, in order to determine the normal value of the subject merchandise. *See* Def.'s Brief at 4. In addition, Commerce issued supplemental questionnaires to address certain questions that had been raised in previous administrative reviews concerning the respondents' reported growing and harvesting-related "factors of production." *See* Decision Memorandum at 2-3; *see also* Issues and Decision Memorandum for the Administrative Review of the Antidumping Duty Order on Fresh Garlic from the Peoples' Republic of China (Ninth Administrative Review), 2005 WL 2290660 (June 13, 2005)

---

By its terms, the order expressly excludes: "(a) Garlic that has been mechanically harvested and that is primarily, but not exclusively, destined for non-fresh use," as well as "(b) garlic that has been specially prepared and cultivated prior to planting and then harvested and otherwise prepared for use as seed." *Id*.

[7]The statute provides for annual administrative review of antidumping duties, at the request of an interested party. 19 U.S.C. § 1675(a). The tenth administrative review at issue here covered the period November 1, 2003 through October 31, 2004.

("Ninth Garlic Review Memorandum"), at comment 1 (considering, and ultimately declining, use

of intermediate input methodology).[8]

 In their responses to Commerce's questionnaires, the respondents provided the agency with

suggested values for their factors of production. *See* Respondents' Second Surrogate Value

Submission (Pub. Doc. No. 418). The Domestic Producers supplied surrogate value information for

the respondents' factors of production, and requested that Commerce use the agency's intermediate

input valuation methodology – as the Domestic Producers had urged in prior reviews – due to

asserted "anomalies and inconsistencies in the . . . data submitted by all of the respondents." Def.-

Ints.' Brief at 3; *see also* Domestic Producers' Surrogate Value Submission (Pub. Doc. No. 82);

Domestic Producers' Second Surrogate Value Submission (Pub. Doc. No. 143) (submitting

information from previous reviews comparing respondents' ranged factors of production data);

---

[8]The statute defines the "factors of production" used in producing merchandise to include, *inter alia*: "(A) hours of labor required, (B) quantities of raw materials employed, (C) amounts of energy and other utilities consumed, and (D) representative capital cost, including depreciation." 19 U.S.C. § 1677b(c)(3). The factors of production for raw garlic bulb include, *inter alia*, seed, water, energy, and labor. *See* Preliminary Results, 70 Fed. Reg. at 69,949-50.

In valuing factors of production, the statute directs Commerce to:

utilize, to the extent possible, the prices or costs of factors of production in one or more market economy countries that are –

(A) at a level of economic development comparable to that of the nonmarket economy country, and

(B) significant producers of comparable merchandise.

19 U.S.C. § 1677b(c)(4).

Ninth Garlic Review Memorandum, 2005 WL 2290660, at comment 1.[9]

Given the concerns expressed in prior reviews as to the reliability of respondents' records, Commerce conducted onsite "harvest verifications" of six respondents in May and June 2005, to assist the agency in determining whether to value intermediate inputs rather than factors of production. *See* Preliminary Results, 70 Fed. Reg. at 69,943; *see also* Harvest Verification Reports (Pub. Doc. Nos. 386, 392, 393). Unlike typical verifications, where Commerce focuses on respondents' books and records (*i.e.*, general ledgers, subledgers, etc.), these harvest verifications involved onsite visits to allow agency personnel to directly observe respondents' actual cultivation and harvesting procedures. *See* Decision Memorandum at 2-3; *see also* Def.'s Brief at 5.

In its Preliminary Results, Commerce concluded that "the books and records maintained by the [Chinese garlic producers] do not report or account for all of the relevant information and do not allow the respondents to identify all of the factors of production necessary to grow and harvest garlic." *See* Preliminary Results, 70 Fed. Reg. at 69,949. Commerce therefore used its intermediate input method of valuation for the respondents' growing and harvesting factors of production, and valued the intermediate input, raw garlic bulb (in lieu of the upstream factors of production used to produce that input), in calculating respondents' dumping margins. Commerce's Final Results similarly reflected the agency's use of its intermediate input methodology to value raw garlic bulb, after again finding respondents' data inadequate. *See generally* Decision Memorandum at 11-22.

While Commerce found the harvesting factors of product data insufficient, Commerce found respondents' reported data on their post-harvesting factors of production (*i.e.*, processing, packaging,

---

[9]Commerce's intermediate input methodology is discussed in detail in section III.A, below.

shipping) to be reliable, both in the Preliminary Results and in the Final Results. The agency

therefore added the surrogate values for those factors of production to the surrogate value of the raw

garlic bulb inputs. *See* Decision Memorandum at 14; *see also generally* Final Results, 71 Fed. Reg.

26,329.

## II. **Standard of Review**

In reviewing Commerce's final determination in an antidumping case, the agency's

determination must be upheld, except to the extent that it is found to be "unsupported by substantial

evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i);

*see also* NMB Singapore Ltd. v. United States, 557 F.3d 1316, 1319 (Fed. Cir. 2009). Substantial

evidence is "more than a mere scintilla"; rather, it is "such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion." Universal Camera Corp. v. Nat'l Labor

Relations Bd., 340 U.S. 474, 477 (1951) (*quoting* Consol. Edison Co. v. Nat'l Labor Relations Bd.,

305 U.S. 197, 229 (1938)); *see also* Mittal Steel Point Lisas Ltd. v. United States, 548 F.3d 1375,

1380 (Fed. Cir. 2008) (same). Moreover, any evaluation of the substantiality of evidence "must take

into account whatever in the record fairly detracts from its weight," including "contradictory

evidence or evidence from which conflicting inferences could be drawn." Suramerica de Aleaciones

Laminadas, C.A. v. United States, 44 F.3d 978, 985 (Fed. Cir. 1994) (*quoting* Universal Camera,

340 U.S. at 487-88); *see also* Mittal Steel, 548 F.3d at 1380-81 (same).

That said, the mere fact that it may be possible to draw two inconsistent conclusions from

the record does not prevent Commerce's determination from being supported by substantial

evidence. Am. Silicon Techs. v. United States, 261 F.3d 1371, 1376 (Fed. Cir. 2001); *see also*

Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966). Finally, while Commerce must explain the bases for its decisions, "its explanations do not have to be perfect." NMB Singapore, 557 F.3d at 1319. However, "the path of Commerce's decision must be reasonably discernable," to support judicial review. *Id*.

### III. Analysis

The Chinese Producers challenge multiple aspects of Commerce's Final Results in the tenth administrative review of fresh garlic from the PRC. Specifically, the Chinese Producers contest: (1) Commerce's decision to utilize an intermediate input methodology in valuing fresh garlic bulb; (2) Commerce's valuation of fresh garlic bulb using a specific subset of domestic Indian pricing data; (3) Commerce's wage rate calculation; (4) Commerce's valuation of ocean freight; (5) Commerce's valuation of packing cartons; (6) Commerce's valuation of plastic jars; and (7) Commerce's inclusion of certain labor expenses as part of manufacturing overhead. Pls.' Brief at 2-4.

As discussed in greater detail below, there is no merit to the Chinese Producers' challenge to Commerce's use of the intermediate input methodology, or their challenge to Commerce's inclusion of certain labor expenses as part of factory overhead. *See* sections III.A & III.G, *infra*. In contrast, Commerce's determinations concerning the valuation of garlic bulb, ocean freight, packing cartons, and plastic jars, and its calculation of the applicable wage rate, cannot be sustained on the existing record. *See* sections III.B-III.F, *infra*. The Chinese Producers' Motion for Judgment on the Agency Record therefore must be granted in part, and this matter remanded to Commerce for further action.

A. Intermediate Input Methodology

The Chinese Producers first challenge the use of Commerce's intermediate input methodology to determine the normal value of raw garlic bulb, asserting that the methodology is contrary to the plain language of the statute and not in accordance with past practice, and that its use did not produce the most accurate normal value. *See generally* Pls.' Brief at 8-14.

The Chinese Producers contend that, when Commerce finds respondents' factors of production information inadequate, Commerce is statutorily required "to base normal value *in its entirety* on the price at which comparable merchandise produced in a comparable market economy is sold in other countries." Pls.' Brief at 8 (*citing* 19 U.S.C. § 1677b(c)(2)). The Chinese Producers further maintain that, even if application of the intermediate input methodology were appropriate in this case, the intermediate input valued must be a "component of the subject merchandise," not the subject merchandise itself. *See id.* at 9. The Chinese Producers' arguments, however, are without merit.

Generally, Commerce calculates normal value in antidumping matters pursuant to 19 U.S.C. § 1677b(a).[10] Where (as here) the subject merchandise was exported from a nonmarket economy ("NME") country,[11] and if Commerce finds that – in light of concerns about the sufficiency or

---

[10]*See* n.3, *supra*.

[11]The statute defines an NME country as "any foreign country that [Commerce] determines does not operate on market principles of cost or pricing structures, so that sales of merchandise in such country do not reflect the fair value of the merchandise." 19 U.S.C. § 1677(18)(A).

In the instant administrative review, as in those that preceded it, Commerce treated the PRC as an NME country and selected India as the surrogate market-economy country. *See* Decision Memorandum at 22; *see also*, *e.g.*, Jinan Yipin Corp. Ltd. v. United States, 31 CIT ____, ____, 526

reliability of the data – the available information "does not permit the normal value of the subject merchandise to be determined under [19 U.S.C. § 1677b(a)]," the statute instructs Commerce to use surrogate values "based on the best available information regarding the values of such factors [of production] in a market economy country or countries considered to be appropriate" by the agency. *See* 19 U.S.C. § 1677b(c)(1).[12]

However, if Commerce finds the available information inadequate for purposes of determining the normal value of the subject merchandise pursuant to the factors of production method (described above), the statute provides that Commerce shall base normal value on the export price of comparable merchandise produced in one or more market economy countries that are economically comparable to the nonmarket economy country at issue.  19 U.S.C. § 1677b(c)(2).

Within this general framework, the statute "accords Commerce wide discretion in the valuation of factors of production in the application of those guidelines"; indeed, the Court of Appeals has "specifically held that Commerce may depart from surrogate values when there are other methods of determining the 'best available information' regarding the values of the factors of production." Shakeproof Assembly Components v. United States, 268 F.3d 1376, 1381 (Fed. Cir. 2001) (*citing* Lasko Metal Prods., Inc. v. United States, 43 F.3d 1442, 1446 (Fed. Cir. 1994)).  In

_____

F. Supp. 2d 1347, 1368 (2007) (eighth administrative review of the antidumping duty order on fresh garlic from PRC); Ninth Garlic Review Memorandum, 2005 WL 2290660, at comment 2.

[12]Specifically, the statute instructs Commerce to "determine the normal value of the subject merchandise on the basis of the value of the factors of production utilized in producing the merchandise and to which shall be added an amount for general expenses and profit plus the cost of containers, coverings, and other expenses."  19 U.S.C. § 1677b(c)(1).  "[T]he valuation of the factors of production shall be based on the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate" by Commerce. *Id*.; *see also* 19 U.S.C. § 1677b(c)(4).

short, when "determining the valuation of the factors of production, the critical question is whether the methodology used by Commerce is based on the best available information and establishes antidumping margins as accurately as possible." Shakeproof, 268 F.3d at 1382.

In prior administrative reviews of the Antidumping Order at issue, Commerce used the factors of production data reported by the respondents (including both harvesting and post-harvesting factors of production), and based its calculation of the normal value of fresh garlic upon those data. *See*, *e.g.*, Ninth Garlic Review Memorandum, 2005 WL 2290660, at comment 1. In the immediately preceding review, however, Commerce acknowledged various flaws in the respondents' factors of production data, and considered whether use of the agency's intermediate input methodology would be appropriate. *See id*. Although the agency ultimately declined to use its intermediate input methodology in the ninth review due to lack of sufficient information, Commerce there indicated that it planned to "fully examine all of these issues in the next administrative review." *Id*.

In the tenth administrative review at issue here, Commerce made good on its promise, and – indeed – decided to use its intermediate input methodology when determining the value of raw garlic bulb. *See* Decision Memorandum at 11-15; Preliminary Results, 70 Fed. Reg. at 69,947-50. As set forth above, in reaching its decision, Commerce sent multiple supplemental questionnaires to the respondent producers of Chinese garlic, and conducted onsite harvest verifications of six of those producers, all in an attempt to verify their harvesting factors of production. *See* Preliminary Results, 70 Fed. Reg. at 69,943; Harvest Verification Reports.

Despite the agency's efforts, Commerce found that "respondents are unable to accurately

report and substantiate the complete costs of growing garlic." *See* Intermediate Input Methodology

Memorandum (Pub. Doc. No. 388), at 3.  Specifically, Commerce stated:

> Evidence on the record of these reviews regarding the recording and accounting
> standards of the garlic industry in the PRC supports a finding that we cannot
> accurately quantify the consumption rates of all relevant [factors of production] used
> to grow, harvest and process the subject merchandise.  Further, the respondents'
> ability to measure and report accurate [factors of production] to the Department is
> greatly diminished by the fact that they lease the land on which the garlic is grown,
> and therefore cannot obtain information on other crops that are grown on this land
> in the off-season, which ultimately affect the [factors of production] for raw garlic.
> Finally, respondents do not keep the types of books and records that would allow the
> Department to establish the appropriateness or accuracy of the reported [factors of
> production].

*Id*. at 10-11.[13]  After determining the surrogate value for the intermediate input at issue – raw garlic

bulb – Commerce added the post-harvesting factors of production, which it had deemed reliable, to

the intermediate value and ultimately arrived at the overall normal value of the subject merchandise.

*See* Decision Memorandum at 14.

Commerce here used its intermediate input methodology *within* the statute's traditional best-

available-factor-of-production-information  valuation  methodology,  and  not  pursuant  to  the

alternative methodology exception established by statute.  *See* Decision Memorandum at 14.  As

---

[13]The evidence of record demonstrates that the respondents: (1) did not adequately "track actual labor hours incurred for growing, tending and harvesting activities and, thus, do not maintain appropriate records"; (2) were not able to adequately report yield loss resulting "from shrinkage that occurs during the production of garlic due to the loss of water weight and the discarding of roots, stems, and skins during processing"; (3) differed significantly in how they reported seed usage, "resulting in vastly divergent reported seed use among respondents"; (4) failed to account for additional variables, such as the effect of the off-season crops grown on the leased land; and (5) kept such inaccurate books and records, that Commerce could not conduct a meaningful standard verification. *See generally*  Def.'s Brief at 15-16 (internal quotation marks and citations omitted). These problems are much the same as the concerns raised in the ninth administrative review. *See* Ninth Garlic Review Memorandum, 2005 WL 2290660, at comment 1.

Commerce explained in its Intermediate Input Methodology Memorandum, Commerce merely

"modif[ied]" its standard upstream factor of production methodology in applying its intermediate

input methodology.  *See* Intermediate Input Methodology Memorandum at 1.  The only difference

is that, in cases where the intermediate input methodology is employed, Commerce believes that,

due to inaccurate or flawed data, or some other anomaly, the best way to value the factors of

production used to produce an intermediate product (here, raw garlic bulb) is through the direct

valuation of that intermediate input.  *See* Decision Memorandum at 14.[14]  Commerce explained that:

> We [Commerce] also disagree with the contentions raised by . . . respondents that we
> relied on [§ 1677b(c)(2)'s alternative methodology exception] to calculate normal
> value.  Rather, using the intermediate input methodology . . . is consistent with [§
> 1677b(c)(1)(B)] because we valued the respondents' reported [factors of production].
> The intermediate input methodology merely allows [Commerce] to value the
> intermediate product (in this case the raw garlic bulb) in lieu of valuing the upstream
> inputs used to produce that intermediate product.  Valuing the intermediate input in
> this way constitutes the "best available information," in accordance with [§
> 1677b(c)(1)(B)].

Decision Memorandum at 14 (discussing application of 19 U.S.C. § 1677b(c)).  None of the Chinese

---

[14]Commerce has previously recognized two separate sets of circumstances where it "will modify its standard [factor of production] methodology" and use its intermediate input methodology. *See* Intermediate Input Methodology Memorandum at 1.  The first scenario is where the factors of production used to produce an intermediate input account for an insignificant share of the total output, and Commerce determines that the increased accuracy to the overall calculation that would result from valuing each of these intermediate input factors of production is insignificant (*i.e.*, the insignificant share exception).  Decision Memorandum at 12; Intermediate Input Methodology Memorandum at 1.  The second instance is where "it is clear that attempting to value the factors used in a production process yielding an intermediate product would lead to an inaccurate result because [Commerce] may not be able to account for a significant element of cost adequately in the overall factors buildup" (*i.e.*, the significant element exception).  Intermediate Input Methodology Memorandum at 1.  *See also* Decision Memorandum at 12; *see generally* Anshan Iron & Steel Co. v. United States, 28 CIT 1728, 358 F. Supp. 2d 1236 (2004) ("Anshan II").

Producers' arguments undermine the soundness of Commerce's reasoning to any significant degree.

The Chinese Producers contend that the statute requires that, if Commerce finds the available factors of production data inadequate, the agency must abandon application of the traditional factor of production method, and instead apply an alternative valuation methodology, basing "normal value *in its entirety* on the price at which comparable merchandise produced in a comparable market economy is sold in other countries." Pls.' Brief at 8 (*citing* 19 U.S.C. § 1677b(c)(2)). But the Chinese Producers are mistaken.

Because the statutory exception that the Chinese Producers invoke "is unclear as to the circumstances in which 'the available information is adequate for purposes of determining the normal value,' the question is whether Commerce's interpretation is based on a permissible construction of the statute." Def.'s Brief at 22 (*citing* Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 843 (1984)).[15] Here, Commerce properly read the statute to require use of an "alternative valuation method" only when "*all* respondents' information is 'inadequate' or unuseable to determine normal value under [§] 1677b(c)(1)." *Id*. at 21. As the Domestic Producers explain, the statute "only directs Commerce to determine the 'quantities of raw materials employed;' [sic] it contains no detailed prescription for how physical [factors of production] are to be identified or a requirement that material [factors of production] be identified with the same level of detail in every case." Def.-Ints.' Brief at 9 (*quoting* 19 U.S.C. § 1677b(c)(3)(B)).

Congress accorded Commerce broad discretion to develop one or more methodologies for valuing factors of production in NME cases, subject only to the fundamental requirement that the

---

[15]The internal quotation is from the text of 19 U.S.C. § 1677b(c)(2).

agency's determinations be "based on the best available information" in every case. *See* 19 U.S.C. § 1677b(c)(1); *see also* Def.-Ints.' Brief at 9-10. Commerce's intermediate input valuation methodology was developed pursuant to the agency's broad statutory authority, and in accordance with its statutory mandate to base its determinations "on the best available information" concerning the values of the factors of production at issue. *See* 19 U.S.C. § 1677b(c)(1); *see also* Def.-Ints.' Brief at 9-11.

The Chinese Producers further claim that "the statute leaves no discretion for the agency to disregard [certain factors of production] and still attempt to calculate normal value pursuant to 19 U.S.C. § 1677b(c)(1)." *See* Pls.' Reply Brief at 3. But Commerce is not forced to abandon § 1677b(c)(1) factors of production valuation merely because a portion of respondents' factors of production data is inadequate.

On its face, the § 1677b(c)(2) exception limits Commerce's ability to determine normal value using that alternative valuation method – *i.e.*, to determine normal value based on the price at which comparable merchandise is "produced in one or more market economy countries that are at a level of economic development comparable to that of the nonmarket economy country," and "sold in other countries, including the United States" – to situations where the agency "finds that the available information is inadequate for purposes of determining the normal value of subject merchandise under [§ 1677b(c)(1)]." 19 U.S.C. § 1677b(c)(2). Using a short-cut to determine factors of production value in certain, limited situations where the factors of production data submitted are inadequate certainly falls within the broad discretion accorded Commerce under the statute.

Commerce here did not conclude that *all* of respondents' factors of production data was

inadequate for determining the normal value of subject merchandise; only a portion was found to be inadequate. As a result, in the present review, there was no need for the agency to resort to the alternative methodology exception in § 1677b(c)(2). *See* Def.'s Brief at 21-23; Def.-Ints.' Brief at 10. Contrary to the Chinese Producers' "all-or-nothing" approach, because the only inaccurate factors of production data concerned the factors of production used to produce raw garlic bulb, Commerce reasonably decided to value that intermediate input (raw garlic bulb) pursuant to the intermediate input methodology (and within the traditional valuation methodology prescribed by § 1677b(c)(1)), while also using the post-harvesting factors of production data that the agency deemed accurate. *See* Def.'s Brief at 22-23. Thus, as the Government and the Domestic Producers maintain, both Commerce's interpretation of the statute and the agency's decision to use its intermediate input methodology in this case are reasonable. *See id.* at 14; Def.-Ints.' Brief at 10.

Turning to Commerce's application of its intermediate input methodology, the Chinese Producers correctly note that, in past cases, Commerce has used that methodology to value a *component* of the subject merchandise. Here, according to the Chinese Producers, raw garlic bulb – the intermediate input at issue – is "the actual product subject to the dumping order." Pls.' Brief at 9.[16] The Chinese Producers' argument is unavailing.

---

[16]Commerce has previously applied the intermediate input methodology to intermediate foodstuff products such as whole fish (in the production of frozen fish fillets) and raw mushrooms (in the production of preserved mushrooms). *See* Issues and Decision Memorandum for the Antidumping Duty Investigation of Certain Frozen Fish Fillets from the Socialist Republic of Vietnam, 2003 WL 24153843 (June 23, 2003), at comment 3; Issues and Decision Memorandum for the Antidumping Duty Administrative and New Shipper Reviews on Certain Preserved Mushrooms from the People's Republic of China, 2001 WL 640661 (June 11, 2001), at comment 2.

The Government explains that, "because the raw garlic bulb is harvested from the ground, and is 'not immediately shipped to the United States,' [and] requires 'at least a minimum amount of processing and packing,' the raw garlic bulb cannot be the subject merchandise." *See* Def.'s Brief at 19 (*quoting* Decision Memorandum at 13). The Government notes that "Commerce's experience in several administrative and new shipper reviews of fresh garlic confirmed this conclusion, showing . . . 'that the garlic harvested from the ground is, at minimum, cleaned to remove the outer skins in order to give the garlic bulb its characteristic white, fresh appearance,'" and "'the whole bulb garlic is then typically packed in mesh bags and cartons for shipment.'" *See id.* at 19 (*quoting* Decision Memorandum at 13). Contrary to the Chinese Producers' assertions, the fact that raw garlic bulb is an advanced intermediate input does not set this case apart from prior cases where Commerce has used its intermediate input methodology.

The Domestic Producers' analysis differs slightly from that of the Government, but reaches the same end. The Domestic Producers concede that raw garlic bulb may be covered by the Antidumping Order. *See* Def.-Ints.' Brief at 12.[17] However, the Domestic Producers go on to note that "the propriety of applying the intermediate input methodology has nothing to do with whether the intermediate inputs in question are within the scope of the antidumping order or not; it depends on whether this methodology achieves a more accurate and legally-defensible result in the particular case." *Id.* at 12.

---

[17]The Domestic Producers state that "[t]he subject merchandise in this case is processed fresh and peeled garlic; raw garlic bulb is only an intermediate input used in the production of that subject merchandise – albeit an input so advanced that raw garlic bulb, if exported by China to the United States, would be covered by the antidumping duty order." Def.-Ints.' Brief at 12.

In any event, the Chinese Producers' emphasis on the scope of the Antidumping Order is misplaced, because (as both the Government and the Domestic Producers note) the subject merchandise in the present case is *not* the raw bulb, but – rather – fresh garlic, which, as described above, obviously requires at least some degree of processing in order to be ready for shipment. *See* Decision Memorandum at 13.

Finally, the Chinese Producers assert that Commerce failed to adequately explain the need to depart from the agency's practice in prior reviews, and its basis for concluding that use of the agency's intermediate input methodology would result in a more accurate margin. *See* Pls.' Brief at 12. As the Chinese Producers acknowledge, "Commerce is permitted to deviate from . . . past practice, at least where it explains the reason for its departure." Allegheny Ludlum Corp. v. United States, 346 F.3d 1368, 1373 (Fed. Cir. 2003) (*citing* Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade, 412 U.S. 800, 808 (1973)). The Chinese Producers seek to make much of the fact that "respondents to this review maintained their books and records in accordance with the methodology employed in previous reviews of this order." Pls.' Brief at 12. But that is of little moment here.

As the Government and the Domestic Producers underscore, in the administrative review immediately preceding the review at issue here, Commerce unequivocally expressed its concerns about the accuracy and reliability of the factors of production data submitted by the respondents and stated the agency's intentions to examine and address those concerns in future reviews. *See* Ninth Garlic Review Memorandum, 2005 WL 2290660, at comment 1; *see also* Def.'s Brief at 17-18; Def.-Ints.' Brief at 14-15. The Domestic Producers explain:

> Although Commerce was not persuaded to depart from use of the traditional
> upstream [factors of production] valuation method in the eighth and ninth reviews
> themselves, it put all parties on notice in the final results of the ninth review that it
> intended to scrutinize the respondents' reported upstream [factors of production]
> very carefully in this tenth review with a view toward moving to use of the
> intermediate input valuation method if its review of the upstream data warranted it.

Def.-Ints.' Brief at 14.

Commerce adequately explained its intermediate input methodology and the agency's reasons for using it in this case (*i.e.*, to obtain the most accurate results) in the Preliminary Results, in the Intermediate Input Methodology Memorandum, and in the Decision Memorandum. *See generally* Preliminary Results, 70 Fed. Reg. at 69,949-50; Intermediate Input Methodology Memorandum; Decision Memorandum at 11-15. Moreover, the agency's reasoning in this case is reinforced by the agency's handling of similar issues in other cases in the past. The law does not require more. *See generally* NMB Singapore, 557 F.3d at 1319 (although agency must explain the bases for its decisions, "its explanations do not have to be perfect," so long as "the path of Commerce's decision . . . [is] reasonably discernable").

In sum, Commerce acted within its discretion in deciding to use the agency's intermediate valuation methodology. Commerce thoroughly explained its reasons for deviating from its practice in prior administrative reviews of the Antidumping Order at issue; and the agency adequately supported its use of the intermediate input methodology within factors of production valuation. The Chinese Producers' challenges to Commerce's use of the intermediate input methodology in this instance must therefore be rejected.

B.  Garlic Bulb Valuation

The Chinese Producers fare better on their challenge to Commerce's surrogate valuation of

the raw garlic bulb input in its calculation of normal value for fresh garlic.  According to the Chinese

Producers, Commerce erred in selecting the Indian Agricultural Marketing Information Network

("Agmarknet") data for the "China" variety of garlic as the basis for the surrogate value of

respondents' garlic bulb input.  The Chinese Producers further assert that Commerce improperly

rejected more representative data that the respondents submitted.  *See generally* Pls.' Brief at 16-17,

20-21.

As section III.A above explains, in a nonmarket economy case such as this, Commerce must

base its surrogate values on "the best available information" from an appropriate market economy

country or countries.   *See* 19 U.S.C. § 1677b(c)(1).  Because the statute does not define "best

available information," Commerce has broad discretion to determine the best available information

"in a reasonable manner on a case-by-case basis." *See* Rhodia, Inc. v. United States, 25 CIT 1278,

1286, 185 F. Supp. 2d 1343, 1351 (2001) (quotation marks and citation omitted).  That discretion,

however, is  "curtailed by the purpose of the statute, *i.e.*, to construct the product's normal value as

it would have been if the NME country were a market economy country." Rhodia, 25 CIT at 1286,

185 F. Supp. 2d at 1351 (*citing* Nation Ford Chem. Co. v. United States, 166 F.3d 1373, 1375 (Fed.

Cir. 1999)).[18]

In the present case, following its decision to apply the intermediate input methodology to

---

[18]*See also*  Goldlink Indus. Co., Ltd. v. United States, 30 CIT 616, 619, 431 F. Supp. 2d
1323, 1327 (2006); Baoding Yude Chem. Indus. Co., Ltd. v. United States, 25 CIT 1118, 1119, 170
F. Supp. 2d 1335, 1337 (2001).

determine normal value, Commerce was required to choose a surrogate value for the intermediate input in question, raw garlic bulb.[19]  Initially, Commerce found that Indian import statistics derived from the World Trade Atlas constituted the best publicly available data for this purpose, and dismissed the use of Agmarknet data.  *See* Preliminary Results, 70 Fed. Reg. at 69,949-50.[20]  In the Preliminary Results, Commerce explained its dissatisfaction with the Agmarknet data, noting that the agency could not "ascertain the quality or nature of the garlic products (*i.e.*, bulbs, loose cloves, etc.)."  Preliminary Results, 70 Fed. Reg. at 69,950.  According to Commerce, this shortcoming was important, because respondents' garlic is a large, high yield, high-quality type of garlic that is distinct from the overwhelming majority of garlic grown in India.  *See* Decision Memorandum at 40-41.  Thus, while the respondents submitted data from the broader Agmarknet database during the course of the review, Commerce initially rejected the use of Agmarknet data based on the agency's belief that the data reflected only small-bulb Indian garlic.  In addition, Commerce was concerned

[19]In the eighth and ninth administrative reviews, Commerce employed the standard upstream factors of production methodology, rather than the intermediate input methodology, and identified a surrogate value for garlic seed using price data derived from the Indian National Horticultural Research and Development Foundation ("NHRDF"); Commerce then calculated surrogate values for the other inputs.  *See* Ninth Garlic Review Memorandum, 2005 WL 2290660, at comment 2; *see also* Fresh Garlic from the People's Republic of China: Final Results of Antidumping Duty Administrative Review and New Shipper Reviews (Eighth Administrative Review), 69 Fed. Reg. 33,626, 33,628 (June 16, 2004) ("Eighth Garlic Review Memorandum").

In the instant review, Commerce's objective was to find the best available surrogate value for the intermediate product (as opposed to previous reviews, where it sought to identify the most appropriate surrogate value for garlic seed and other upstream factors of production).

[20]The World Trade Atlas has been described as "a database of commodities using all levels of the Harmonized Tariff Schedule," which "enables users to determine the value of a specific product and identify countries to or from which the product is being exported or imported." Longkou Haimeng Mach. Co. v. United States, 32 CIT ____, ____ n.17, 581 F. Supp. 2d 1344, 1361 n.17 (2008).

that it could not determine whether the Agmarknet figures were tax-exclusive. *See id*. at 40; *see also*

Def.'s Brief at 25.

In the Final Results, Commerce reversed course and concluded that the Agmarknet data

reflecting values for the Indian domestic garlic identified as "China" variety was the best overall

source of Indian price information. *See* Decision Memorandum at 40-41. Explaining its decision

to rely on the Agmarknet data, Commerce stated:

> [T]he [Agmarknet] database represents daily garlic bulb prices from wholesale
> markets in 21 out of 28 Indian states plus the National Capital Territory of Delhi.
> Therefore, we find that Agmarknet data are *broadly representative* of garlic bulb
> prices throughout India as noted by several respondents. Second, the database
> represents market transactions covering the period November 1, 2003 through
> October 31, 2004, and therefore, we find the data to be contemporaneous with the
> review.

*Id*. at 42 (emphasis added). Commerce also noted that the Agmarknet database was publicly

available; but the agency had to concede that it still had no firm indication as to whether the

Agmarknet figures were inclusive of taxes. *See id*. Finally, and most importantly, Commerce noted

that Agmarknet lists prices for six separate varieties of garlic, one of which is the "China" category.

Conspicuously absent from the Agmarknet data, however, is any description of those categories.

*See id*. at 40, 42.

Obviously conscious that its task was "to value large-sized garlic bulb because this is the

primary characteristic that distinguishes the type of garlic exported by the PRC respondents from

the majority of garlic sold in India," Commerce found the "China" variety of garlic to be most

similar to the respondents' garlic – even though no description of "China" variety garlic was

provided, and seemingly based on nothing more than perhaps the name of the variety, and the fact

that it had a higher weighted-average price. *See* Decision Memorandum at 42-44.

To be sure, Commerce enjoys broad discretion in determining what constitutes the best information available. Nevertheless, Commerce may not act arbitrarily. "In determining the valuation of the factors of production, the critical question is whether the methodology used by Commerce is based on the best available information and establishes antidumping margins as accurately as possible." Shakeproof, 268 F.3d at 1382. The statutory objective of calculating dumping margins as accurately as possible can be achieved only when Commerce's choice as to what constitutes the best available information evidences a rational and reasonable relationship to the factor of production that it represents. And, as the Chinese Producers assert, Commerce's speculation here – that higher-price-equals-bigger-bulb – cannot suffice to establish the requisite rational and reasonable relationship between respondents' garlic bulb input and the Agmarknet "China" variety of garlic. *See* Pls.' Brief at 23. In short, absent evidence on the nature and characteristics of Agmarknet's "China" variety of garlic bulb, Commerce's decision to use the "China" variety prices was impermissibly speculative. *See id*. at 17.

Commerce's reliance on the Domestic Producers' Market Research Report (submitted in the course of the administrative review) does little, if anything, to buttress the agency's decision. As the Market Research Report explains it, Chinese garlic exported to the United States has an average bulb diameter of greater than 40 millimeters, while garlic typically grown and sold in the Indian market has an average bulb diameter of only 20 to 40 millimeters. Decision Memorandum at 42-43; *see also generally* Market Research Report (Pub. Doc. No. 41). The Market Research Report stated that this typical Indian garlic is cultivated in "short-day" zones, rather than "long-day" zones (which

have longer periods of sunlight, and which are where larger, high-yield garlic is cultivated). Decision Memorandum at 41 (*citing* Market Research Report at 11).[21]

The Market Research Report specifically identified Agrifound Parvati (a large Indian garlic variety) as one of the three varieties of garlic with characteristics similar to the Chinese garlic grown by respondents. Decision Memorandum at 41; *id*. n.110 (*citing* Ninth Garlic Review Memorandum, 2005 WL 2290660, at comment 2; Market Research Report at 18). According to Commerce, "Agrifound Parvati is a clonal garlic believed to be of Chinese genetic origin that was developed by NHRDF and is the closest variety (in terms of genetic origin, specifications, etc.) to Chinese garlic." *Id*. at 41 (*citing* Market Research Report at 18). Commerce further indicated that "use of such clonal varieties, developed mainly by NHRDF, are increasing in certain areas in India due to the efforts of NHRDF and other institutions, and that this development is in sharp contrast to the rest of the county where local varieties dominate." *Id*. (*citing* Market Research Report at 13-17, 18).

The Chinese Producers contend that – from Commerce's recitation of certain information from the Domestic Producers' Market Research Report (outlined above) – the agency then "made a substantial leap . . . and concluded without any evidentiary support that the minute group of sales designated as 'China' variety in the Agmarknet data must represent sales of this larger garlic being cultivated in the 'long-day' regions." *See* Pls.' Brief at 17; *see also* Decision Memorandum at 41.

The Chinese Producers' assessment is not far off the mark. The language of Commerce's

---

[21]The "long-day" zones are defined as agro-climatic zones above 30 degrees north latitude which are characterized by longer periods of sunlight vis-a-vis the "short-day" zones, which are below 30 degrees north latitude and enjoy less sunlight. Decision Memorandum at 41; Market Research Report at 10-11.

summation of the Market Research Report, and the agency's phrasing of its ultimate conclusion on this point, are telling.[22]  The stated rationale for the agency's selection of Agmarknet's "China" variety data as the surrogate value for raw garlic bulb in this case was largely speculative and conclusory, and lacks adequate support in the evidentiary record.

Even the Domestic Producers are "not prepared to defend Commerce's choice of the price for garlic designated as 'China' in the Agmarknet data as the surrogate value for raw garlic bulb." Def.-Ints.' Brief at 17.[23]  All that the Domestic Producers are prepared to defend is "the principle underlying Commerce's choice – that is, the notion that the surrogate value for raw garlic bulb should, as much as possible, be representative of the large-bulb garlic exported by respondents to the United States." *Id.*  Such a "notion," however, lends Commerce no support in its decision to select the "China" variety of Agmarknet garlic, in particular, as a basis for surrogate value here.

---

[22]Summarizing what it gleaned from the Domestic Producers' Market Research Report, Commerce concluded in its Decision Memorandum that "while smaller local varieties remain the predominant type of garlic grown in India, large-bulb garlic – similar to that grown by the PRC respondents – is being grown in various parts of India and is beginning to make inroads vis-a-vis the locally cultivated, small-bulb Indian varieties." *See* Decision Memorandum at 41 (*citing* Market Research Report at 13-17).

From the referenced information, drawn from the Market Research Report, Commerce reached its ultimate conclusion:

> Based on the evidence of the increasing availability of the large-sized garlic bulb in India and absent contrary information, [the agency] find[s] it reasonable to conclude that the variety indicated as "China" is representative of the distinctively larger garlic produced by the PRC respondents.

Decision Memorandum at 42.

[23]The Domestic Producers initially filed their own action seeking review of Commerce's decision in this respect; however, that action was voluntarily dismissed.

The Government struggles to mount a defense of Commerce's decision, gamely arguing that the price differential between "China" variety garlic and other Indian garlic "*would* be expected *if* the 'China' variety garlic reflected the larger Agrifound Parvati bulb." *See* Def.'s Brief at 28 (emphases added). However, the conjecture and contingency reflected in "woulds" and "ifs" belie the sound evidentiary basis required to support the agency's conclusion "that the Agmarknet 'China' variety garlic was the most appropriate surrogate for respondents' garlic." *See id*. at 28.

The Government emphasizes that "the information regarding garlic bulb derived from the other reported garlic varieties in the Agmarknet database . . . did not reveal any physical characteristics demonstrating that they were similar to respondents' large bulbed garlic." Def.'s Brief at 28. But the very same can be said of the information on the "China" variety. *See* Decision Memorandum at 42 ("there are no descriptions provided by Agmarknet which define these variety categories"). The Agmarknet database provides no physical description of any of the listed varieties of garlic bulb, including the "China" variety.

Distilled to its essence, the Government's argument in support of Commerce's selection of the "China" variety data as the best available information is basically the same as the basis set forth by the agency itself in its Decision Memorandum – that is, that a higher price *may* be indicative of a larger bulb, and that such a larger bulb *may* be the Agrifound Parvati bulb, which, in turn, *may* be similar to the respondents' garlic bulb. *See* Def.'s Brief at 26-28; Decision Memorandum at 41-43. The tenuous nature of that logic is self-evident.

The Chinese Producers point to other problems with Commerce's selection of the Agmarknet "China" variety data as well. *See generally* Pls.' Brief at 17, 21. For example, the Chinese

Producers note that "China" variety garlic is apparently grown only in three Indian states (Punjab, Gujarat, and Haryana). But only one of those states (Punjab) is within the long-day growing region where Agrifound Parvati – the Indian variety which reportedly may be the most similar to the respondents' Chinese garlic – is found. *See id*. at 20-21. In other words, in an effort to base surrogate value on the "China" variety of garlic bulb, Commerce selected a dataset made up primarily of *non*-long-day-zone regions, and rejected the Chinese Producers' effort to select a dataset more representative of long-day zones (which the Domestic Producers contend, and Commerce accepted, is most likely where garlic comparable to respondents' garlic is grown). *See id*. Such inherently illogical reasoning undermines Commerce's selection and use of the "China" variety as the basis for surrogate value here.

And there are other seeming contradictions in Commerce's position that are problematic. For example, the Chinese Producers emphasize that Commerce assertedly predicated its decision to use Agmarknet data on the fact that the Agmarknet data were broad-based and country-wide. Yet Commerce ultimately based the surrogate value on data from a subset of Indian garlic (the "China" variety) grown only in three Indian states, which essentially contradicted the agency's rationale for using the Agmarknet data in the first place. *See* Pls.' Brief at 20-21; *see also* Decision Memorandum at 42 (emphasizing that "Agmarknet data are broadly representative of garlic bulb prices throughout India").

Underscoring the apparent irony of Commerce's decision, the Chinese Producers note that Commerce rejected their proposal to use sales prices contained in the Agmarknet database for states where the Market Research Report indicates that high-yield, high-quality garlic predominates (*i.e.*,

the states of Himachal Pradesh, Uttaranchal, and Jammu and Kashmir), based on the agency's reasoning that:

> it is [Commerce's] practice to use country-wide data instead of regional data when the former is available. Moreover, we attempt to find the most representative, least distortive . . . market-based value. The more broad-based the value, the greater the likelihood that the value [is] representative.

Pls.' Brief at 20-21 (*quoting* Decision Memorandum at 45). Thus, not only is Commerce's selection of "China" variety garlic as the "best available information" unsupported by the evidence, but it also seems inherently inconsistent with Commerce's stated rationale for rejecting the respondents' proposed data (*i.e.*, that the data were not country-wide).

Finally, the Chinese Producers maintain that, because the Agmarknet data that Commerce used constituted price information representative of the final product (fresh garlic sold at market), the data intrinsically already reflected post-harvest factors of production. *See* Pls.' Brief at 11-12. Thus, the Chinese Producers contend, Commerce impermissibly inflated the surrogate value of fresh garlic by adding additional post-harvest factors of production (*e.g.*, sales, packing, and transportation costs) to a figure that already reflected such costs. *See id.* at 11-12; *see also* Pls.' Reply Brief at 5. While there is a certain logic to the Chinese Producers' argument, they have not demonstrated that use of the intermediate input methodology in fact results in double counting. On remand, however, Commerce should consider this possible inconsistency and the potential for double counting that may result when using data from the Agmarknet database, which presumably contains information regarding Indian market transactions and is representative of the *final* garlic product rather than an *intermediate* garlic product (*i.e.*, garlic bulb). *See* Pls.' Brief at 12-14.

As the Chinese Producers emphasized at oral argument, Commerce's use of Agmarknet data

for the intermediate input appears to conflict with its prior claim that raw garlic – the intermediate

input – is not the subject merchandise because it requires further processing to become market-ready

fresh garlic (the final product).  *See* Recording of Oral Argument at 1:50:00.  As Commerce noted,

the post-harvest factors of production in India may differ from those of respondents.  But, on

remand, Commerce should be mindful that, when valuing an intermediate product in an NME

country case, it must find a surrogate representative of that intermediate product.  *See* Decision

Memorandum at 52-53; *see also* Def.'s Brief at 29-30.[24]  Here, it is unclear whether Agmarknet's

Indian garlic is adequately representative of the respondents' "intermediate" garlic bulb.

Commerce has broad discretion in this arena; but its decisions nonetheless cannot be

arbitrary, and must have a solid foundation in the evidentiary record.  The Government here

contends that Commerce selected the "China" variety of garlic bulb as listed in the Agmarknet

database because that garlic comes from three different states in different regions (unlike the

regional data proposed by the Chinese Producers, which – the Government claims – may be subject

to regional price distortions).  *See* Def.'s Brief at 31.  The Chinese Producers' proposed data set may

or may not be the "best available information"; but, contrary to the Government's assertions,

Commerce has not established that the long-day-region data proffered by the Chinese Producers

suffers from any distortions.  *See id.*

---

[24]Commerce found that none of the respondents' packaging expenses are included in the Agmarknet data.  *See* Decision Memorandum at 52.  Commerce also stated that "none of the type of packaging or processing inputs used by . . . respondents for their exports of peeled garlic . . . are included in the garlic bulb prices quoted by Agmarknet."  *Id*.  But that finding is relevant only to peeled garlic, and does not necessarily equate Indian market-ready garlic with the respondents' intermediate input (raw garlic bulb).

In light of the numerous flaws and discrepancies in Commerce's reasoning (as summarized above), Commerce has failed to adequately support its selection of Agmarknet's "China" variety garlic bulb as the basis for its surrogate valuation of respondent's garlic bulb input. This issue therefore must be remanded to the agency, so that it may reconsider its valuation of respondents' garlic bulb input, taking into consideration the evidence and the arguments that the Chinese Producers have advanced here.

## C. Wage Rate Calculation

Taking issue with Commerce's wage rate calculation, the Chinese Producers contend that the PRC wage rate used in this review – calculated pursuant to the agency's "long-standing regression-based methodology" – does not reflect the wage rates in market economy countries comparable to the PRC; that Commerce failed to explain why the results produced by the regression methodology are more accurate than the alternatives proposed by the Chinese Producers; and that Commerce's calculation contravenes established precedent. *See generally* Pls.' Brief at 24-31; Pls.' Reply Brief at 8-9; *see also* Def.'s Brief at 55 (referring to Commerce's "long-standing regression-based methodology"); Expected Non-Market Economy Wages: Request for Comment on Calculation Methodology, 70 Fed. Reg. 37,761 (June 30, 2005) (same). Because Commerce has failed to adequately explain, justify, and support its methodology (including its application in this case), this issue must be remanded to Commerce for further consideration.

When constructing the normal value of a product from an NME country, Commerce must determine the "hours of labor required" as a factor of production. *See* 19 U.S.C. § 1677b(c)(3). Like other factors of production, Commerce is directed to value labor "utiliz[ing], to the extent

possible, the prices or costs of factors of production in one or more market economy countries that are[:] (A) at a level of economic development comparable to that of the nonmarket economy country, and (B) significant producers of comparable merchandise." 19 U.S.C. § 1677b(c)(4). In doing so, Commerce essentially creates a "hypothetical" market value to approximate the production experience in the NME country. *See* Nation Ford, 166 F.3d at 1377-78. The valuation of an NME-country producer's cost of labor, however, is treated differently from the valuation of other factors of production. *See* Dorbest v. United States, 30 CIT 1671, 1703, 462 F. Supp. 2d 1262, 1291 (2006), *appeal docketed*, No. 2009-1257, -1266 (Fed. Cir. Mar. 20, 2009) ("Dorbest I") (*citing* 19 C.F.R. § 351.408(c)(3) (2003)); *see also* Decision Memorandum at 50.

Commerce is permitted to depart from typical surrogate valuation and to value factors of production according to source data outside of the data from the chosen surrogate country – provided that the "methodology used by Commerce is based on the best available information and establishes antidumping margins as accurately as possible." Shakeproof, 268 F.3d at 1381-82 ("we have specifically held that Commerce may depart from surrogate values when there are other methods of determining the 'best available information' regarding the values of the factors of production").[25] Commerce has determined that "in calculating wage rates, an analysis different in some aspects from valuing other [factors of production is] warranted in light of [the agency's] concerns about wide

---

[25]*See also* Nation Ford, 166 F.3d at 1378 n.5 (the antidumping duty statute "does not preclude consideration of pricing or costs beyond the surrogate country if necessary"); Lasko Metal, 43 F.3d at 1446 ("Where [Commerce] can determine that a NME producer's input prices are market determined, accuracy, fairness, and predictability are enhanced by using those prices. Therefore, using surrogate values when market-based values are available would, in fact, be contrary to the intent of the law.") (internal quotation marks and citation omitted); *see also* Dorbest I, 30 CIT at 1706, 462 F. Supp. 2d at 1293.

variances in wage rates between comparable economies." *See* Decision Memorandum at 50.

Accordingly, in valuing the cost of labor in NME cases, Commerce employs "regression-based wage

rates reflective of the observed relationship between wages and national income" in a variety of

market economy countries. 19 C.F.R. § 351.408(c)(3)[26]; *see also* Dorbest I, 30 CIT at 1703, 462 F.

Supp. 2d at 1291.[27] In other words, unlike its valuation of other factors of production in an NME

case, Commerce bases its surrogate wage rate on data from a broad "basket" of countries, and does

not limit itself to market economy countries at a level of economic development comparable to the

NME country in question. *See* Dorbest I, 30 CIT at 1706, 462 F. Supp. 2d at 1293.

In the case at bar, Commerce employed a labor rate of $0.97 per hour – Commerce's

---

[26]Commerce's regulation specifies that the agency is to "calculate the wage rate to be applied in nonmarket economy proceedings each year." 19 C.F.R. § 351.408(c)(3). The calculation is to be "based on current data" and "made available to the public." *Id.*

[27]Dorbest I concisely describes Commerce's regression methodology:

Using this regression analysis, Commerce determines the relationship between countries' per capita Gross National Product ("GNI") and their wage rates; Commerce approximates the wage rate of the PRC by using the PRC's GNI as the variable in the equation that was the result of the regression.

\* \* \* \*

For wage rate data used to calculate the regression, because of the practices of the respective data sources, there is normally a two-year interval between the current year and the most recent reporting year of the data required for Commerce's methodology. Therefore, Commerce uses the "most recent reporting year" provided by each country and inflates those values, *i.e.*, multiplies the values by the rate of inflation. Commerce calculates the wage rate regression once a year and uses that regression to calculate the wage rate for all investigations and administrative reviews in [NME countries] conducted during that year.

Dorbest I, 30 CIT at 1703-04, 462 F. Supp. 2d at 1291 (internal quotation marks and citations omitted); *see also* Zhejiang Native Produce & Animal By-Products Import & Export Group Corp. v. United States, 32 CIT ____, 2008 WL 2410210 *13 (2008).

calculated wage rate for 2003 for the PRC, derived through the agency's regression-based analysis of a wage rate data set from some 50-plus market economy countries, including "the most industrialized and advanced countries in the world," using data from the Yearbook of Labour Statistics published by the International Labour Organization ("ILO"). *See* Decision Memorandum at 48-51; *see also* Preliminary Results, 70 Fed. Reg. at 69,950.

The Chinese Producers contested the Preliminary Results, raising three main objections. First, the Chinese Producers argued that the statute requires Commerce to calculate a wage rate based on wage rate data from the principal surrogate country, India – a market economy country "at a level of economic development comparable to that of the nonmarket economy country" which is a "significant producer[] of comparable merchandise." *See* Decision Memorandum at 47; Pls.' Brief at 24-25; 19 U.S.C. § 1677b(c)(4). The Chinese Producers further challenged the inclusion in Commerce's regression analysis of non-comparable countries (such as Switzerland, the United Kingdom, Norway, and Germany), in conflict with the asserted statutory directive to use surrogate values derived from economically comparable countries. *See* Decision Memorandum at 47-48; Pls.' Brief at 24-25;19 U.S.C. § 1677b(c)(4)(A). Finally, the Chinese Producers argued that Commerce's labor rate calculation "inexplicably ignored" the available 2003 data for 14 countries, and should include all available data. *See* Decision Memorandum at 48; Pls.' Brief at 25.

In its Final Results, Commerce rejected the Chinese Producers' arguments, and reaffirmed that, for the administrative review at issue here, "the appropriate surrogate value for the wage rate for the PRC respondents continues to be the wage rate of $0.97/hour." *See* Decision Memorandum at 49-51.

The Chinese Producers argue that the Final Results on the surrogate value for the wage rate in this case comprise "arguments, conclusions and findings that are directly contradicted by record evidence," such that Commerce's determination is not supported by substantial evidence. *See* Pls.' Brief at 26-27. The Chinese Producers target, in particular, Commerce's conclusion that its regression model "reflects 'market economy wage rates at a comparable level of economic development.'" *Id*. at 26 (*quoting* Decision Memorandum at 50). The Chinese Producers contend that Commerce's conclusion "is directly contradicted by record evidence . . . [which] show[s] that the regression model does not reflect, and in fact drastically overstates, the market wage rates in countries at a comparable level of economic development." *Id*. The Chinese Producers emphasize that Commerce's calculated wage rate of $0.97/hour is "400% higher than India's actual wage rate of $0.23/hr. and much higher than the wage rates of other countries found to be economically comparable to China." *Id*. The Chinese Producers further note that Commerce's calculated wage rate for China "is much higher than the actual rates of Pakistan ($0.38), Sri Lanka ($0.34), and the Philippines ($0.80), countries found by Commerce to be economically comparable to China." *Id*.

The Government does not specifically dispute any of the facts as stated by the Chinese Producers. Nor does the Government respond directly to the Chinese Producers' charge that Commerce's conclusion that the agency's regression model reflects "market economy wage rates at a comparable level of economic development" is not supported by substantial evidence (except that the Government baldly asserts at one point in its brief that "Commerce's wage rate calculation *is* supported by substantial evidence"). *See* Def.'s Brief at 54 (emphasis added); *see generally id*. at 54-58.

Instead, the Government argues that Commerce properly decided "not to rely on the sole wage rate from the selected surrogate country because, while per capita [Gross National Product] rates and wages are positively correlated, there is great variation in the wage rates of the market economy countries that it treats as economically comparable." *See* Def.'s Brief at 55 (*quoting* Decision Memorandum at 49) (internal quotation marks omitted). The Government explains that "[u]nlike other surrogate values for valuing merchandise, such as water, ocean freight, etc., which do not vary significantly from country to country, labor is unique because 'immigration, welfare and general wage support programs' can greatly influence wage rates in each country and 'two economically comparable economies' can have very different wage rates as a result." *Id*. (*quoting* Decision Memorandum at 49). Accordingly, the Government states, "since 2000, the regression methodology has been 'based on data from a wide range of [56] market economy countries' to enhance 'the accuracy, predictability and stability of the wage rate.'" *Id*. (*quoting* Decision Memorandum at 49). The Government similarly argues that Commerce properly declined to expand the "basket" of labor data used in its analysis to include additional countries. *See id*. at 56-58.

However, mere arguments and explanations do not constitute "evidence" – much less "substantial evidence." As the Chinese Producers point out, Dorbest I took note of the same types of seeming distortions (vis-a-vis Commerce's labor rate calculation for 2002), and remanded the matter to Commerce. *See* Pls.' Brief at 27 (*citing* Dorbest I, 30 CIT at 1710-13, 462 F. Supp. 2d at 1296-98). Dorbest I similarly questioned the bases for Commerce's assertion that its regression methodology in that case enhanced "the accuracy, predictability and stability" of the wage rate used there – the same justification that Commerce invokes here. *See* Dorbest I, 30 CIT at 1710-12, 462

F. Supp. 2d at 1297-98; Decision Memorandum at 49 (stating that Commerce "finds that its regression methodology, based on data from a wide range of market economy countries, enhances the accuracy, predictability and stability of the wage rate"). Just as Commerce's determination in Dorbest I was found to be unsupported by substantial evidence, so too Commerce's determination here is lacking. The matter therefore must be remanded to the agency for further consideration.

The Chinese Producers also criticize the Final Results on the grounds that Commerce "failed to give valid reasons for the selection of its methodology and [its] rejection of the alternatives" that the Chinese Producers proposed – specifically, "calculating the labor rate based on 1) the wage rate in India; or 2) all available data from market economy countries." *See* Pls.' Brief at 28-29.

The Government first asserts generally that "Commerce has no affirmative obligation to prove that its regulation [providing for the use of regression-based wage rates] is superior" to alternatives, citing Lasko Metal for the proposition that "policies adopted by Commerce are reasonable when they enhance accuracy, fairness, and predictability." *See* Def.'s Brief at 56 (*citing* Lasko Metal, 43 F.3d at 1446). As noted above, however, it is Commerce's unsupported assertion that the agency's methodology enhanced "the accuracy, predictability and stability of the wage rate" that lies at the very heart of this dispute. *See* Decision Memorandum at 49; *see generally* Dorbest I, 30 CIT at 1710-12, 462 F. Supp. 2d at 1297-98. Moreover, the Government's argument does not speak to the Chinese Producers' challenge to the size and composition of the "basket" of countries selected for Commerce's regression analysis. The Government's argument thus fails to meet the thrust of the Chinese Producers' point.

As to the Chinese Producers' first proposed alternative – that Commerce value wage rates

using only India wage data – the Government argues simply that the wage rate methodology set forth in its regulations "expressly rejects the India-only methodology posited by [the Chinese Producers], and is consistent with 19 U.S.C. § 1677b(c) and Commerce's overriding obligation to construct the most accurate normal value." *See* Def.'s Brief at 55-56. But, as the Chinese Producers note, Commerce's stated underlying rationale is that "using data from a single market-economy country comparable to China (*i.e.*, India, Indonesia, Pakistan, Sri Lanka, and the Philippines) 'would not provide [Commerce] with a sufficiently large data set to conduct a reliable regression analysis.'" Pls.' Brief at 28 (*quoting* Decision Memorandum at 50). The Chinese Producers further note that Dorbest I faulted Commerce for its failure to explain its selection of the regression methodology over other possible alternatives, stating: "While Commerce's model may be the best information available on the record, . . . Commerce has failed to give a viable explanation for its choice in light of [the] possible distortion of its predicted wage rates for countries such as the PRC." *See id*. (*quoting* Dorbest I, 30 CIT at 1711, 462 F. Supp. 2d at 1297). Similarly, Commerce in this case has failed to adequately explain its decision "to use a regression based methodology that [at least arguably] results in distorted and unrepresentative wage rates versus a single wage rate from India, the country [Commerce] has found most comparable to China." *See id*.

The Government also seeks to brush aside the Chinese Producers' second proposed alternative (that Commerce expand its "basket" of labor data to include data from 19 additional countries), asserting that there is no "record evidence demonstrating that such a change would result in a more accurate wage rate." Def.'s Brief at 56; *see also id*. at 56-58. As the Chinese Producers observe, however, the Government is attempting to gloss over key findings and determinations in

the Final Results, such as Commerce's finding that its analysis in this case was based "on a basket of countries . . . that is *sufficiently robust* to conduct a meaningful regression analysis." *See* Pls.' Brief at 28-29 (*quoting* Decision Memorandum at 51) (emphasis added). That assertion (and others of its ilk) are mere conclusory statements, unsupported on the existing record, and cannot withstand judicial scrutiny. *See* Dorbest I, 30 CIT at 1711, 462 F. Supp. 2d at 1297; *see generally* Pls.' Brief at 28-29.

In addition, the Government argues that, in light of time constraints, it was not "feasibl[e]" for Commerce to expand the basket of countries used for its analysis in this review, and, moreover, that such a change could have been effected only through notice-and-comment rulemaking. *See* Def.'s Brief at 56-58. Dorbest I made short work of these same two arguments, however. *See* Dorbest I, 30 CIT at 1709-10, 462 F. Supp. 2d at 1295-96; *see also* Wuhan Bee Healthy Co. v. United States, 31 CIT ____, ____, 2007 WL 2071537 at * 15-16 (2007) ("Wuhan I") (rejecting same two arguments by Commerce); Zhejiang Native Produce & Animal By-Products Import & Export Group Corp. v. United States, 32 CIT ____, ____, 2008 WL 2410210 at * 15 (2008) (same).[28] They are no more compelling here.

The Chinese Producers' third and final argument is that Commerce's calculation of the labor rate in this review "runs contrary to" Dorbest I, which, according to the Chinese Producers, is "direct legal precedent" mandating rejection of "[Commerce's] calculation of the labor rate and its justification for the arbitrary exclusion of certain countries" from its analysis in this case. *See* Pls.'

---

[28]*Cf*. Wuhan Bee Healthy Co. v. United States, 32 CIT ____, _____ , 2008 WL 2217466 at * 2 (2008) ("Wuhan II") (noting that, on remand, Commerce "expanded the basket of countries" used in its analysis, and adequately explained wage rate calculation).

Brief at 29, 31.

Dorbest I is not binding here, of course. *See* Algoma Steel Corp. v. United States, 865 F.2d 240, 243 (Fed. Cir. 1989) (explaining that one judge on the Court of International Trade is not bound by decisions of another judge on the court). As the analysis above suggests, Dorbest I is nevertheless highly instructive, as are other recent opinions on this same issue. *See*, *e.g.*, Dorbest v. United States, 32 CIT ____, ____, 547 F. Supp. 2d 1321, 1324-30 (2008), *appeal docketed*, No. 2009-1257, -1266 (Fed. Cir. Mar. 20, 2009) ("Dorbest II")[29]; Wuhan I, 31 CIT at ____, 2007 WL 2071537 at * 13-16; Wuhan Bee Healthy Co. v. United States, 32 CIT ____, ____, 2008 WL 2217466 at * 1-3 (2008) ("Wuhan II"); Zhejiang, 32 CIT at ____, 2008 WL 2410210 at * 13-15; Allied Pacific Food (Dalian) Co. v. United States, 32 CIT ____, ____, 587 F. Supp. 2d 1330, 1351-61 (2008) ("Allied Pacific II").[30] On remand, Commerce will have ample opportunity to consider

[29]Commerce's use of the regression methodology was ultimately sustained in Dorbest II – but only after Commerce detailed its rationale and marshaled substantial evidence to support its decision in the remand results filed following Dorbest I. *See generally* Dorbest II, 32 CIT at ____, 547 F. Supp. 2d at 1325-30. In those remand results, Commerce reflected the results of notice and comment rulemaking concerning data selection and methodology for determining labor wage rates in NME countries, considered various methodologies, explained away seeming distortions such as those raised by the Chinese Producers here, and otherwise adequately supported its decision to use the regression model and the particular dataset there at issue. *See* Dorbest II, 32 CIT at ____, 547 F. Supp. 2d at 1325-30.

[30]A recent decision of this court, Allied Pacific II, for the first time squarely held Commerce's regression methodology regulation to be inconsistent with the governing statute. *See generally* Allied Pacific II, 32 CIT at ____, 587 F. Supp. 2d at 1351-61. Specifically, Allied Pacific II presented the question "whether Commerce, in determining the surrogate labor rate according to its regulation [19 C.F.R. § 351.408(c)(3)] and its methodology, has satisfied *both* the first and the second criterion stated in [19 U.S.C.] § 1677b(c)(4), *i.e.*, *both* the 'economic comparability' criterion and the 'significant producer' criterion." *See id.*, 32 CIT at ____, 587 F. Supp. 2d at 1355 (*citing* 19 U.S.C. § 1677b(c)(4)) (emphases added). The court concluded that "both the methodology Commerce used to develop the . . . surrogate labor rate and the regulation under which that methodology was applied" cannot be reconciled with the statute, because, *inter alia*, "the regulation

the implications of those cases for this case, and any other relevant developments (as appropriate),[31]

taking into consideration the Chinese Producers' arguments, as well as the discussion here.

Accordingly, in the absence of sufficient evidence and adequate explanation and justification

to support Commerce's use of its regression methodology to calculate the applicable wage rate here,

and in light of the agency's failure to properly consider the Chinese Producers' objections and other

alternative approaches, this matter must remanded to Commerce for further consideration.

---

does not permit a surrogate labor rate to be determinate for an individual proceeding and thereby precludes consideration of any investigation-specific information." *See id*., 32 CIT at ____, 587 F. Supp. 2d at 1353, 1356.

In the course of its analysis, the court in Allied Pacific II reviewed a number of cases often cited to support Commerce's regression methodology in particular and/or its broad discretion in valuing factors of production in general. *See* Allied Pacific II, 32 CIT at ____, 587 F. Supp. 2d at 1359–61 (discussing, *inter alia*, Nation Ford, 166 F.3d 1373; Shakeproof, 268 F.3d 1376; Lasko Metal, 43 F.3d 1442). The court determined, however, that none of those decisions stands for the proposition that Commerce is permitted to "adopt a methodology, by regulation or otherwise, under which Commerce cannot consider labor costs in one or more surrogate countries that potentially are better [sources of] information than the country-wide labor cost information that the regulation, and methodology implementing it, requires Commerce to use." *Id*., 32 CIT at ____, 587 F. Supp. 2d at 1360; *see generally id*., 32 CIT at ____, 587 F. Supp. 2d at 1359-61.

In the aftermath of Allied Pacific II, the continued vitality of Commerce's regulation and the regression methodology are uncertain. However, the Chinese Producers here have not raised the precise issue presented in Allied Pacific II; no party sought leave to file supplement briefs on the matter; and, as discussed above, Commerce has failed to adequately explain or support its use of the regression methodology in this case. There is therefore no need to consider the validity of Commerce's regulation (or its regression methodology) at this time, though Commerce obviously should be mindful of Allied Pacific II in considering this issue on remand.

[31]*See*, *e.g.*, Antidumping Methodologies: Market Economy Inputs, Expected Non-Market Economy Wages, Duty Drawback; and Request for Comments, 71 Fed. Reg. 61,716 (Oct. 19, 2006).

D.  Ocean Freight Valuation

The Chinese Producers also contest the surrogate value that Commerce calculated for ocean freight costs, which the agency based on price quotes for refrigerated containers as published by Maersk Sealand.  *See generally* Pls.' Brief at 31-38; Pls.' Reply Brief at 9-11.  The Chinese Producers first argue that the Maersk rates used by Commerce reflect distortions and are not representative of the expenses that the Chinese Producers and other respondents actually incurred. *See* Pls.' Brief at 32-33; Pls.' Reply Brief at 9-10.  In addition, the Chinese Producers fault Commerce for rejecting the three alternative data sources that the respondents placed on the record. *See* Pls.' Brief at 33-38; Pls.' Reply Brief at 9-11.[32]  For the reasons detailed below, this issue too must be remanded to Commerce for redetermination.

In the Preliminary Results, Commerce calculated surrogate ocean freight costs using general cargo quotes that the agency had obtained from Maersk.  *See* Preliminary Results, 70 Fed. Reg. at 69,950.  The Chinese Producers and other respondents disputed Commerce's use of those Maersk quotes, and placed additional ocean freight cost data on the record.  *See* Decision Memorandum at 59-60; *see also* Respondents' Second Surrogate Value Submission (Pub. Doc. No. 418), Exhs. V-IX. The respondents' additional data included rates for Maersk refrigerated containers, which the Chinese Producers state they placed on the record for the sole purpose of showing that the Maersk price quotes were aberrational "because they contained additional charges not incurred by the

---

[32]The three alternative data sources, discussed in detail below, are: (1) an average of the actual ranged values incurred by the respondents; (2) data from the Descartes Carrier Rate Retrieval database; and (3) public price quotes from another carrier, Evergreen Marine, which did not include certain additional charges reflected in the Maersk rates.  *See* Decision Memorandum at 59; Respondents' Second Surrogate Value Submission, Exhs. V-VIII.

respondents." *See* Pls.' Brief at 31.  In its final margin calculations, however, Commerce calculated

the ocean freight surrogate value using the Maersk quotes for refrigerated containers.  *See* Decision

Memorandum at 62; *see also* Respondents' Second Surrogate Value Submission, Exhs. VIII and IX.

In deciding to rely on the Maersk rates for refrigerated containers that the Chinese Producers had

placed on the record, Commerce rejected the other three sources of data that the respondents

favored.  *See generally* Decision Memorandum at 60-62; Def.'s Brief at 32-38.

Commerce first rejected the use of public versions of the market economy ocean freight rates

actually paid by the respondents, on the grounds that the rates were not accurate because they had

been adjusted within ten percent of actual cost in order to protect proprietary information.  *See*

Decision Memorandum at 60.  Commerce stated that the agency's policy is to use ranged data only

in the absence of more accurate information, and expressed concern that it would be impossible for

the agency to make adjustments to improve the accuracy of the data without disclosing proprietary

information.  *See id*. at 60; *see also* Def.'s Brief at 38 (*citing* Allegheny Ludlum Corp. v. United

States, 27 CIT 1461, 1467-68 (2003)).

Commerce similarly rejected data from the Descartes database, a web-based service that

numerous ocean freight carriers use to publish their rates in order to comply with Federal Maritime

Commission regulations.  *See* Decision Memorandum at 61; Pls.' Brief at 34.  Commerce based its

refusal to use the Descartes data on the fact that Descartes is a fee-based service, and expressed

reservations about the agency's ability to corroborate the accuracy of the rate information reflected

in the database.  *See* Decision Memorandum at 61.

Commerce rejected the respondents' third source of data – ocean freight price quotes from Evergreen Marine – on the grounds that those quotes reflected rates for "generic cargo" and were therefore insufficiently specific. *See* Decision Memorandum at 61.

The Chinese Producers maintain that the Maersk price quotes for refrigerated containers that Commerce used in the Final Results are not representative of the respondents' actual commercial activity during the period of review, because those Maersk rates reflect both (1) a Qingdao-to-Hong Kong-to-U.S. shipping route that – according to the Chinese Producers – no respondent to this review used, and (2) an additional inland "PRC arbitrary charge" that results in an additional $1,200 per container, which – according to the Chinese Producers – no respondent incurred. *See* Pls.' Brief at 32-33; Pls.' Reply Brief at 9-10; *see also* Decision Memorandum at 59.[33] According to the Chinese Producers, the Maersk price quotes thus are "aberrational surrogate values," which Commerce should be required to discard. *See* Pls.' Brief at 32-33. As Commerce noted, however, the Chinese Producers provided no evidence to support their bare assertions that they did not use the shipping route at issue and that they did not incur the "PRC arbitrary charge." *See* Decision Memorandum at 61.

On the other hand, the Chinese Producers (together with other respondents) did place on the record ample alternative data that Commerce failed to adequately consider in selecting the Maersk quotes as the basis for the surrogate value of the respondents' ocean freight costs. Not only did Commerce fail to sufficiently analyze those alternative sources of data, but – in addition – it failed

---

[33]The "PRC arbitrary charge" is a charge placed on cargo that is transported through Hong Kong. *See* Decision Memorandum at 59.

to adequately explain why the Maersk data that it used was appropriately representative for the purpose (*i.e.*, to approximate the respondents' ocean freight costs). *See* Decision Memorandum at 61-62; Pls.' Reply Brief at 9 (*citing* Shangdong Huarong Gen. Corp. v. United States, 25 CIT 834, 838-39, 159 F. Supp. 2d 714, 719-20 (2001)).[34]

The Chinese Producers make a strong case that the most accurate source for surrogate ocean freight values is the publicly-available, ranged data on the market economy ocean freight rates that were actually paid by the respondents to this review. *See* Pls.' Brief at 35-36. Even recognizing Commerce's policy to use ranged figures only in the absence of *more accurate* data on the record, Commerce has failed to establish, through citations to record evidence, that the Maersk price quotes are in fact *more accurate* than the ranged data reflecting the ocean freight rates that the respondents actually paid to ship their actual subject merchandise during the period of review at issue here. *See id.*[35]

---

[34]Describing the relevant review paradigm, Shangdong Huarong aptly stated that:

> Despite the broad latitude afforded Commerce and its substantial discretion in choosing the information it relies upon, the agency must act in a manner consistent with the underlying objective of 19 U.S.C. § 1677b(c) – to obtain the most accurate dumping margins possible. This objective is achieved only when Commerce's choice of what constitutes the best available information evidences a rational and reasonable relationship to the factor of production it represents.

Shangdong Huarong, 25 CIT at 838, 159 F. Supp. 2d at 719 (citation omitted).

[35]In its entirety, the stated rationale for Commerce's conclusion that the Maersk quotes for refrigerated containers are the best publicly-available source for surrogate valuation consists of a mere two brief paragraphs:

> [Commerce] continues to believe that Maersk Sealand is the best publicly-available source from which to value ocean freight in the instant reviews. Maersk Sealand is a public source that has often been used by the Department in NME cases to value

Moreover, as the Chinese Producers point out, Commerce in the past has frequently used

publicly-available, ranged data to value relatively minor inputs, such as ocean freight. *See* Pls.'

Brief at 36 (*citing* Notice of Final Determination of Sales at Less Than Fair Value: Barium

Carbonate from the People's Republic of China, 68 Fed. Reg. 46,577 (Aug. 6, 2003); Certain

Preserved Mushrooms from the People's Republic of China: Final Results and Partial Rescission of

the New Shipper Review and Final Results and Partial Rescission of the Third Antidumping Duty

Administrative Review, 68 Fed. Reg. 41,304 (July 11, 2003); Notice of Final Determination of Sales

at Less Than Fair Value: Melamine Institutional Dinnerware Products from the People's Republic

of China, 62 Fed. Reg. 1708 (Jan. 13, 1997)).

Furthermore, the public versions of the market economy ocean freight rates actually paid by

the respondents in this review are the very type of information that Commerce used as the basis for

---

ocean freight. The price quotes, with all of the inclusive charges, are actual rates charged by a market economy supplier to ship cargo from Quingdao to the United States. . . .

However, [Commerce] does find that the general cargo rates from Maersk Sealand are less specific to the subject merchandise than the Maersk Sealand rates for refrigerated goods that the GDLSK respondents placed on the record in their surrogate value submission following the Preliminary Results. Where possible, it is the Department's practice to choose surrogate values that are as specific to the input being valued as possible. Here, we find that the publicly available Maersk Sealand rates for refrigerated cargo is more applicable to the rates that the PRC respondents would be charged when shipping garlic to the United States because garlic is generally shipped in refrigerated containers. Accordingly, for these final results, the Department will use the publicly available refrigerated cargo rate quotes from Maersk Sealand that . . . respondents have placed on the record to calculate a surrogate value for ocean freight for those respondents that purchased their ocean freight from an NME supplier.

Decision Memorandum at 61-62 (footnotes omitted).

the surrogate value for ocean freight charges in the eighth administrative review of the Antidumping

Order on fresh garlic from the PRC. *See* Issues and Decision Memorandum for the Administrative

Review and New Shipper Reviews of the Antidumping Duty Order on Fresh Garlic from the

People's Republic of China (Eighth Administrative Review), 2004 WL 3524395 (June 16, 2004)

("Eighth Garlic Review Memorandum"), at comment 5; *see also* Pls.' Brief at 35-36.  Commerce

there rejected the use of Maersk Sealand data in favor of the actual market economy rates paid by

one of the respondents, finding those actual market economy rates to be the "most accurate rate

available":

> Because this is a rate actually incurred and paid for in a market-economy currency
> by a respondent in a review of this antidumping duty order on fresh garlic from the
> PRC, we have determined that it is the most accurate rate available and selected it
> as the surrogate value for shipments to the west coast. We adjusted this rate to arrive
> at a surrogate value for shipments to the east coast.

Eighth Garlic Review Memorandum, 2004 WL 3524395, at comment 5; *see also* Pls.' Brief at 35-36.

Under these circumstances, Commerce's bases for rejecting the publicly-available, ranged data on

the market economy ocean freight rates actually paid by the respondents to this review are not

sufficient.

Commerce's dismissal of the Descartes data is similarly lacking adequate support in the

record, and was not sufficiently explained by the agency.  It is true that Commerce declined to use

the Descartes database in previous administrative reviews specifically because it is a fee-based

service to which the agency did not subscribe. *See* Def.'s Brief at 36.  But, as the Chinese Producers

note, the mere fact that a service is fee-based does not preclude the use of data from that service in

determining surrogate values.  In fact, as the Chinese Producers emphasize, Commerce has routinely

used data from fee-based services – including Descartes, as well as the World Trade Atlas and other services – in calculating surrogate values in the past. *See* Pls.' Brief at 34; *see also* Def.'s Brief at 36.[36] Even in the instant administrative review, Commerce used World Trade Atlas data in valuing the respondents' cardboard carton and plastic jar inputs. *See* Preliminary Results, 70 Fed. Reg. at 69,950; Decision Memorandum at 64, 68.

The Government argues that "simply because Commerce has subscribed to paid databases in the past, it is not required to obtain paid memberships to each and every paid database." Def.'s Brief at 36. The Government also emphasizes Commerce's stated preference for publicly-available data. *See* Def.'s Brief at 36-37. As the Chinese Producers observe, however, because the Descartes database is used by ocean freight carriers to publish rates in conformance with Federal Maritime Commission regulations, the underlying Descartes data are (at least indirectly) publicly-available.

---

[36]For instances in which Commerce has used data from fee-based services (such as Descartes or the World Trade Atlas), *see*, *e.g.*, Certain Non-Frozen Apple Juice Concentrate From the People's Republic of China:  Preliminary Results of 2001-2002 Administrative Review and New Shipper Review and Partial Rescission of Administrative Review, 68 Fed. Reg. 40,244, 40,248 (July 7, 2003) (using Descartes database to value respondents' international freight expenses); Certain Non-Frozen Apple Juice Concentrate From the People's Republic of China:  Preliminary Results of New Shipper Review, 68 Fed. Reg. 44,741, 44,743 (July 30, 2003) (same); Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China: Final Results of 2003-2004 Administrative Review and Partial Rescission of Review, 71 Fed. Reg. 2517, 2522 (Jan. 17, 2006) (valuing packing material inputs using a weighted-average unit value derived from the World Trade Atlas online); Notice of Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination: Chlorinated Isocyanurates from the People's Republic of China, 69 Fed. Reg. 75,294, 75,300 (Dec. 16, 2004) (valuing raw material inputs using import data from the World Trade Atlas online); Certain Preserved Mushrooms from the People's Republic of China: Final Results of Sixth Antidumping Duty New Shipper Review and Final Results and Partial Rescission of the Fourth Antidumping Duty Administrative Review, 69 Fed. Reg. 54,635, 54,641 (Sept. 9, 2004) (valuing prices of certain chemicals using the World Trade Atlas online); Amended Notice of Final Results of the Antidumping Duty Administrative Review: Petroleum Wax Candles from the People's Republic of China, 69 Fed. Reg. 20,858, 20,859 (Apr. 19, 2004) (using Indian import data from the World Trade Atlas online to derive the value of banding straps).

And, as such, the underlying information is generally susceptible to verification. *See* Pls.' Brief at 34-35.

In valuing factors of production, Commerce must balance its need for accurate rate information against its preference for publicly-available information, ever cognizant of its primary, over-arching objective – to calculate dumping margins as accurately as possible. *See* Shakeproof, 268 F.3d at 1382; Allied Pacific Food (Dalian) Co. Ltd. v. United States, 30 CIT 736, 760-61, 435 F. Supp. 2d 1295, 1316-17 (2006) ("Allied Pacific I") ("19 U.S.C. § 1677b(c) . . . does not require Commerce to use publicly available information to value the factors of production"; agency "must balance the interests of transparency and verification that are served by public availability with other considerations, including the desirability of data that are as specific as possible"). Commerce's summary rejection of the Descartes data here cannot be sustained.

Finally, the Evergreen Marine data, which the respondents placed on the record and which Commerce rejected as insufficiently specific, resembled the Maersk data that Commerce actually used, except that the Evergreen data did not reflect the Qingdao-to-Hong Kong-to-U.S. shipping route (a routing which the Chinese Producers maintain that respondents never used). *See* Pls.' Brief at 36-37; *see also* Decision Memorandum at 61. In its brief, the Government now asserts that Commerce erred in the Final Results when the agency indicated that the difference between the Maersk rates used in the Preliminary Results and those used in the Final Results was between rates for non-refrigerated and refrigerated shipments, when – according to the Government – the real difference was between general cargo rates and rates for "containers of garlic." *See* Def.'s Brief at 35 (quotation marks and citations omitted).

At a minimum, the Government's challenge to Commerce's position as stated in the agency's

Final Results has the effect of muddying the waters on the relative merits of the Maersk data *versus*

the Evergreen data. Moreover, it is not clear that the Maersk data submitted by the respondents

following the Preliminary Results were in fact garlic-specific (or even vegetable-specific), as the

Government now contends they were. *See* Def.'s Brief at 32-33, 35; Respondents' Second Surrogate

Value Submission, Exhs. VIII and IX.[37] Further, it is undisputed that the Evergreen quotes reflect

charges for refrigerated containers, and that garlic is shipped in refrigerated containers. *See*

Decision Memorandum at 61-62 (noting that "garlic is generally shipped in refrigerated

containers"). But neither Commerce nor the Government has pointed to any evidentiary support for

the notion that special refrigerated containers (with special garlic-specific or vegetable-specific

shipping rates) even exist, much less that such containers and such rates were used by the

respondents here. Commerce's dismissal of the Evergreen rates on the grounds that they "are not

as specific to the subject merchandise as [the Maersk data]" thus has not been sufficiently explained

or supported in the evidentiary record. *See* Decision Memorandum at 61.

For all these reasons, Commerce's determination on this matter cannot be sustained against

the Chinese Producers' attacks. On remand, Commerce is directed to reconsider its determination

---

[37]At one point in its brief, the Government appears to assert that the Maersk rates used in the Final Results were for "containers of garlic," while elsewhere (but on the same page) the Government indicates only that the Maersk rates were "specific to the shipment of refrigerated vegetables." *See* Def.'s Brief at 35. This seeming discrepancy only further muddies the waters on this point.

It appears that the quoted rates within the particular class of refrigerated container cover shipment of anything from fats and oils to quiche, wonton skins, and fruit on a stick, *i.e.*, items that need to be refrigerated when shipped. *See* Respondents' Second Surrogate Value Submission (Pub. Doc. No. 418), Exhs. VIII and IX.

as to the surrogate value for the respondents' ocean freight expenses, in light of the Chinese

Producers' arguments and the record evidence, consistent with this opinion.

### E. Carton Valuation

The Chinese Producers next dispute Commerce's valuation of certain packing inputs –

specifically, the surrogate values for cardboard cartons (reviewed here) and for plastic jars (analyzed

in section III.F, below).

The Chinese Producers contend that Commerce erred in using Indian import data as the basis

for the surrogate value for the cardboard cartons used to pack and ship the respondents' garlic. The

Chinese Producers maintain that Commerce instead should have selected a surrogate value derived

from the price quotes for domestic Indian boxes that the Chinese Producers submitted for the

agency's consideration. *See generally* Pls.' Brief at 38-47; Pls.' Reply Brief at 11-13. Indeed,

according to the Chinese Producers, the value based on the Indian import statistics "is more than

three times higher than the average of the price quotes for domestic packing boxes because the

Indian import statistics [1] include specialty boxes [and] [2] [boxes] that were transported by air."

*See* Decision Memorandum at 62.

As discussed below, the domestic Indian box prices submitted by the Chinese Producers

were not without problems. Even so, Commerce failed to adequately explain and justify its

conclusion that the Indian import statistics were the best available information. Nor did Commerce

properly support its decision to use those data by reference to substantial evidence in the record.

In prior administrative reviews, Commerce valued the cartons used to pack and ship the

respondents' garlic using a figure derived from Indian import statistics for Harmonized Tariff

Schedule ("HTS") subheading 4819.1001, which covered boxes made of corrugated paper and paperboard. *See* Def.'s Brief at 38-39; Ninth Garlic Review Memorandum, 2005 WL 2290660, at comment 7; Eighth Garlic Review Memorandum, 2004 WL 3524395, at comment 3; *see also* Jinan Yipin Corp., Ltd. v. United States, 31 CIT ____, ____, 526 F. Supp. 2d 1347, 1376-79 (2007) (analyzing challenge to Commerce's valuation of packing cartons in eighth administrative review). In the period of review at issue here, however, that HTS subheading was no longer valid.

The domestic producers placed on the record of this review certain Indian import statistics for HTS subheading 4819.1010 (which now encompasses the boxes of corregated paper and paperboard formerly covered by HTS 4819.1001). *See* Def.'s Brief at 39; Domestic Producers' Surrogate Valuation Submission (Pub. Doc. No. 82), at 9, Exh. 17. The Chinese Producers, in turn, submitted price quotes for "packing cartons identical to the type used by [the Chinese Producers]," which were obtained from four Indian vendors of cardboard boxes, in four different cities across the country. Pls.' Brief at 38; Decision Memorandum at 62; *see also* Respondents' Surrogate Value Submission (Pub. Doc. No. 81), Exh. 17.

In the Preliminary Results, Commerce rejected the price quotes that the Chinese Producers had obtained from Indian box vendors, and instead relied on the Indian import data provided by the domestic producers. *See* Preliminary Results, 70 Fed. Reg. at 69,950; Preliminary Factors Valuation Memorandum (Pub. Doc. No. 400), at 11-12. Thereafter, respondent Dong Yun submitted additional information to Commerce, from Eximkey.com,[38] which indicated that the Indian import data for HTS subheading 4819.1010 covered a very wide variety of products, including so-called

---

[38]Eximkey.com is a source of trade intelligence data.

"specialty boxes" and gift boxes, as well as other types of non-packing cartons and boxes. *See* Dong Yun's Surrogate Value Data Submission (Pub. Doc. No. 249), Exh. 2; Pls.' Brief at 44-45; Pls.' Reply Brief at 12-13. In the Final Results, Commerce nonetheless continued to rely upon the Indian import data provided by the domestic producers, rather than using the domestic Indian box prices that the Chinese Producers had obtained. *See* Decision Memorandum at 63-65.

As outlined in section III.A above, Commerce is entitled to great latitude and substantial discretion in selecting the information that it relies upon in reaching its determinations. Yet Commerce "must act in a manner consistent with the underlying objective of 19 U.S.C. § 1677b(c) – to obtain the most accurate dumping margins possible," an "objective . . . achieved only when Commerce's choice of what constitutes the best available information evidences a rational and reasonable relationship to the factor of production it represents." Shangdong Huarong Gen. Corp. v. United States, 25 CIT 834, 838, 159 F. Supp. 2d 714, 719 (2001); *see also* Guangdong Chem. Imp. & Exp. Corp. v. United States, 30 CIT 85, 96, 414 F. Supp. 2d 1300, 1310-11 (2006) (Commerce is accorded wide discretion in selection of data sources for use in administrative review; role of court is to determine whether Commerce's choice of data was reasonable) (*citing* Nation Ford, 166 F.3d at 1377).

Based on the existing record, it is far from clear that the Indian import statistics used by Commerce were the best available information in this case.

Commerce rejected the use of the domestic Indian box prices, stating that the price quotes did not "meet the criteria of public availability that the Department has historically relied upon when choosing appropriate surrogate values." Decision Memorandum at 64. As the Chinese Producers

note, neither the statute nor the regulations define "public availability."  *See* Pls.' Brief at 41.

Commerce has typically cited concerns about "public availability" in declining to use private market

studies commissioned by interested parties.  In Writing Instrument Manufacturers, for example, the

court sustained Commerce's rejection of a private study in favor of prices taken from a trade journal,

for purposes of valuing basswood logs.  Writing Instrument Mfrs. v. United States, 21 CIT 1185,

1202, 984 F. Supp. 629, 644 (1997), *aff'd*, 178 F.3d 1311 (Fed. Cir. 1998).  The court noted that the

journal prices were preferable to the private study, because the journal prices provided accurate,

market-based information and represented "a reliable source insulated from conflicts of interest."

*Id*., 21 CIT at 1202, 984 F. Supp. at 644.

The Chinese Producers maintain that neither of the concerns identified in Writing Instrument

Manufacturers is present in this case.  According to the Chinese Producers, the domestic Indian box

prices  "are market based prices," and "there is no question about a conflict of interest."  *See* Pls.'

Brief at 41.  The Chinese Producers state that (unlike a private study, for example) the price quotes

were not commissioned, but – rather – were "published [by the Indian vendors of packing boxes]

in the ordinary course of business as a response to a request for prices," by a "disinterested third

party."  *See id*. at 41.[39]

In the Final Results, however, Commerce noted that "[n]o detail on the parties that requested

---

[39]The Chinese Producers also argue, in essence, that – even if the price quotes were not otherwise "publicly available" information – the domestic Indian box prices became publicly available information when the Chinese Producers submitted them for inclusion in the administrative record here.  *See* Pls.' Brief at 41.  As they say in the South, however, "that dog won't hunt."  By such logic, virtually *anything* (including, for example, the privately-commissioned study at issue in Writing Instrument Manufacturers) could be transformed into publicly available information by the alchemy of placing the information on the record of an administrative proceeding.

the prices, or whether or not an affiliation existed between the requester and the Indian companies,

was ever placed on the record." Decision Memorandum at 64; *see also* Def.'s Brief at 40. Further

detailing its reservations, the agency explained:

> [Commerce] must be cautious in using selective price quotes. A respondent could,
> for example, receive ten quotes, and provide [Commerce] with only the two or three
> it prefers. A respondent could also potentially influence the quote it receives from
> a company. There are many unknowns that accompany a price quote, so
> [Commerce] does not favor the use of such information if other publicly available
> data are on the record.

Decision Memorandum at 64.[40]

To be sure, as the Chinese Producers underscore, Commerce has pointed to no actual

affirmative evidence of a distortion or evidence of an affiliation tainting the domestic Indian box

price prices at issue here. Pls.' Brief at 40-42, 47; Pls.' Reply Brief at 13.[41] Absent any such

evidence, the Chinese Producers assert, Commerce is – in effect – improperly presuming distortion

---

[40]The Government argues in its brief: "It is undisputed that Commerce has no information regarding the Indian companies, the requester of the price quotations, the relationship, if any, between [the] Indian companies and the requester of the price quotations, the means of contact between the Indian companies and the requester, or even the market conditions with regard to carton supplies and demand during the two day window in which the quotations were obtained." Def.'s Brief at 42 (*citing* Kaiyuan Group Corp. v. United States, 28 CIT 698, 720, 343 F. Supp. 2d 1289, 1310 (2004), *aff'd*, 188 Fed. Appx. 996 (Fed. Cir. 2006) (stating that, where information is within respondent's control, it is responsibility of respondent to provide to Commerce information that is needed for agency's calculations)).

[41]In a similar situation, the Hebei Metals court pointed out that a plaintiff foreign producer/exporter had indicated in its comments on a remand determination that "[t]he record plainly shows that [the plaintiff foreign producer/exporter] does not import its coal," although it "[did] not cite the record to support this view." Hebei Metals & Minerals Imp. & Exp. Corp. v. United States, 29 CIT 288, 296 n.4, 366 F. Supp. 2d 1264, 1271 n.4 (2005) (quotation marks and citation omitted). "On the other hand," the court noted with approval, "[the plaintiff foreign producer/exporter] correctly observes that 'there is absolutely no record evidence suggesting that Indian fence post producers use imported coal in their operations.'" *Id.*

and affiliation.  *See* Pls.' Brief at 42; *but see* Def.'s Brief at 42 (*citing* <u>Kaiyuan Group Corp. v.</u>

<u>United States</u>, 28 CIT 698, 720, 343 F. Supp. 2d 1289, 1310 (2004), *aff'd*, 188 Fed. Appx. 996 (Fed.

Cir. 2006) (stating that it is respondent's responsibility to provide information within its control

which is necessary for agency's calculations)).[42]  And, the Chinese Producers argue, predicating an

agency determination "on nothing but unfounded speculation" is impermissible.  Pls.' Brief at 41-42.

Finally, as the Chinese Producers emphasize, Commerce's preference for publicly available

information is simply that – a preference.  *See generally* Pls.' Brief at 42-43.  And, as the Chinese

Producers note, all other things being equal, a mere preference can never "trump" Commerce's

paramount obligation under the statute – to use the best available information to calculate dumping

margins as accurately as possible.  *See* Pls.' Brief at 42-43 (*citing*, *inter alia*, <u>Rhone Poulenc, Inc.</u>

<u>v. United States</u>, 899 F.2d 1185, 1191 (Fed. Cir. 1990); <u>Horner v. Jeffrey</u>, 823 F.2d 1521, 1531 (Fed.

Cir. 1987); <u>Hebei Metals & Minerals Imp. & Exp. Corp. v. United States</u>, 29 CIT 288, 299, 366 F.

---

[42]The Government points to <u>Kaiyuan</u> as an illustration of Commerce's "longstanding policy concerns related to price quotations and its preference for publicly available information that is the least subject to manipulation."  *See* Def.'s Brief at 42 (*citing* <u>Kaiyuan</u>, 28 CIT at 724-25, 343 F. Supp. 2d at 1314  (sustaining agency decision to value input using Indian import statistics, rather than price quotes); *also citing* Final Determination of Sales at Less Than Fair Value: Certain Cut-to-Length Carbon Steel Plate From the People's Republic of China, 62 Fed. Reg. 61,964, 61,981 (Nov. 20, 1997)).  *See also* Commerce Policy Bulletin 04.1, Non Market Economy Surrogate Country (March 1, 2004) (stating that Commerce practice is "to use investigation or review period-wide average prices, prices specific to the input in question, prices that are net of taxes and import duties, prices that are contemporaneous with the period of investigation or review, and publicly available data") (*quoted in* Decision Memorandum at 63); Issues and Decision Memorandum for Final Results of the Antidumping Duty Administrative Review on Synthetic Indigo from the People's Republic of China, 2003 WL 24153859 (Sept. 12, 2003), at Comment 4 (discussed in Decision Memorandum at 65).

Supp. 2d 1264, 1273-74 (2005)).[43]  Accordingly, the Chinese Producers point out, Commerce has

used non-publicly available information in the past in situations where it constituted the best

information available to the agency.  *See* Pls.' Brief at 43 & n.11 (citing examples).

Against this backdrop, Commerce's rejection of the domestic Indian box prices in favor of

the use of Indian import statistics must be considered, in the context of the agency's overarching

obligation to use the best available information to calculate dumping margins as accurately as

possible.  *See* Hebei Metals, 29 CIT at 295-96, 366 F. Supp. 2d at 1270-71 (explaining that "'best

available information' standard set forth in [the statute] does not permit Commerce to choose

between two unreasonable choices, *i.e.*, two surrogate coal values that have an unexplained relation

to the coal used by [the respondent] . . . Commerce [is] required to obtain adequate evidence for the

---

[43]The Chinese Producers note that Commerce expressly recognized the overriding precedence of the goal of accuracy in this context when the agency amended its regulations in 1997, revising the stated preference from "published information" to a preference for "publicly available information," to allow the agency greater flexibility to use the most accurate surrogate information available.  *See* Pls.' Brief at 43.  Commerce there explained:

> [P]aragraph (c)(1) drops the preference for published information, limiting the preference to publicly available information.  The publicly available standard is aimed at promoting transparency, while the deletion of the published information standard enables the Department to achieve greater accuracy when information on the specific factor can be derived outside of published sources. . . . [This change] is intended to reflect the Department's preference for input specific data over the aggregated data that frequently appears in published statistics.

Notice of Proposed Rulemaking and Request for Public Comments, 61 Fed. Reg. 7308, 7344 (Feb. 27, 1996).

The Chinese Producers sum up: "Thus, the preference for publicly available information was adopted to promote the Department's obligation to 'achieve greater accuracy' in its selection of surrogate values.  The preference was never intended to act as a prohibition against using more accurate surrogate data."  Pls.' Brief at 43 (*quoting* 61 Fed. Reg. at 7344; *citing* Horner, 823 F.2d at 1531).

value *it* selected" ) (emphasis added).

The Chinese Producers maintain that "[n]ot only do the domestic [Indian box] prices . . . satisfy [Commerce's] established criteria for surrogate value selection," but, moreover, "the Indian Import Statistics are woefully distorted." *See* Pls.' Brief at 44. Indeed, the Chinese Producers assert that the Indian import statistics are so fatally flawed that Commerce did not even have "two reasonable surrogate values from which to choose" – that is, that the domestic Indian box prices were the only reasonable source for surrogate value, and thus, by definition, the best information available to the agency in this case. *See id*. at 45.

As a threshold matter, the Chinese Producers correctly observe that – all other things being equal – there is a preference for Commerce's use of domestic data, rather than import statistics such as those that the agency relied on in this case. *See generally* Pls.' Brief at 38-40; Hebei Metals, 29 CIT at 299-300, 366 F. Supp. 2d at 1273-74 ("A domestic price is preferred for the calculation of surrogate values by prior practice, policy, and logic. All else being equal, tax- and duty-free domestic data is clearly preferable over import data . . . "); Rhodia, 25 CIT at 1287, 185 F. Supp. 2d at 1352 ("Commerce has a stated preference for the use of the domestic price over the import price, all else being equal").[44]

_____

[44]*See also*, *e.g.*, Ferrovanadium and Nitrided Vanadium from the Russian Federation: Notice of Final Results of Antidumping Duty Administrative Review, 62 Fed. Reg. 65,656, 65,661 (Dec. 15, 1997) (Commerce has "articulated a preference for a surrogate country's domestic prices over import values"); Sulfanilic Acid From the People's Republic of China; Final Results of Antidumping Duty Administrative Review, 63 Fed. Reg. 63,834, 63,838 (Nov. 17, 1998) ("domestic prices are preferred . . . if both domestic and import prices are available on a tax- and duty-exclusive basis, all else being equal"); *but see* Shanghai Foreign Trade Enters. Co. v. United States, 28 CIT 480, 493, 318 F. Supp. 2d 1339, 1350 (2004) ("Commerce has a preference for using import statistics to value material inputs because they are publicly available published information and do not include domestic taxes or subsidies.").

Quite apart from the well-established general preference for domestic data (in lieu of import

statistics),[45] the Chinese Producers also identify two basic problems specific to the Indian import

_____

[45]Hebei Metals succinctly summarizes some of the policy underpinnings of the preference
for the use of domestic data, rather than import statistics:

> In addition to being a Commerce policy in accordance with precedent, the
> conditional preference for domestic data is a logical starting point for achieving the
> objective set by Congress. In a hypothetical world of [an] NME country as a market
> economy country from which taxes, duties, and other governmental interference have
> been excluded, it is reasonable to assume that a domestic price reflects the value of
> a factor of production more accurately than an import price. This assumption may
> be undermined by record evidence showing how an import price more accurately
> reflects the actual costs incurred by a producer of the relevant product, but this must
> be explained reasonably by Commerce.

Hebei Metals, 29 CIT at 300, 366 F. Supp. 2d at 1274-75; *see also* Yantai Oriental Juice Co. v.
United States, 26 CIT 605, 617 (2002) (concluding that Commerce erred in using import data –
rather than domestic prices – in determining surrogate value for coal; faulting agency for failure to
explain "how the use of seemingly more expensive imported coal data is the best available
information establishing the actual costs incurred by Indian . . . producers [of the subject
merchandise]"; holding that, where a fungible commodity is available domestically, it is
unreasonable for agency to presume that domestic importers would use more expensive imports,
absent supporting evidence and explanation).

Consonant with both the policy underpinnings of the preference for domestic data in
determining surrogate values and the fundamental realities of the commercial world, the Chinese
Producers here take strong exception to "[Commerce's] implication that [the respondents] would
import more expensive specialty boxes," noting that such action would not be "representative of
business realities in India." *See* Pls.' Brief at 40. Emphasizing that "the purpose of the statute is to
construct the . . . normal value [of a product] as it would have been if the NME country were a
market economy country," the Chinese Producers pointedly observe that "Indian garlic companies
have no reason to buy more expensive imported boxes," since basic packing cartons such as those
used to pack and ship garlic "can be supplied domestically." *Id*.

The Chinese Producers underscore their point:

> The same is true in China; the [Chinese Producers] source their packing boxes
> domestically. Logically, if the Chinese companies were in India, they would not buy
> the more expensive imported boxes and ship them by air to their factories.

statistics provided by the domestic producers and used by Commerce in this case.

First, the Chinese Producers point out that it is undisputed that HTS subheading 4819.1010 (the subheading for which Commerce has Indian import statistics) covers gift, specialty, and other non-packing boxes, in addition to the sort of plain cardboard packing cartons that the respondents here used to ship their garlic. *See* Pls.' Brief at 38, 44-47; Pls.' Reply Brief at 11-13; *see also* Decision Memorandum at 64 (admitting that "there are many different types of boxes covered by the Indian HTS category"). The Chinese Producers argue that the Indian import statistics are thus "less specific" than the domestic Indian box prices vis-a-vis the product being valued by the surrogate (*i.e.*, the boxes that the respondents actually used to ship their garlic). *See* Pls.' Brief at 45-46; Pls.' Reply Brief at 13.

And, second, the Chinese Producers note that it is similarly undisputed that the Indian import statistics provided by the domestic producers include certain air freight charges, which – according to the Chinese Producers – serve to further distort the average unit price reflected in those statistics. *See* Pls.' Brief at 40, 44-46; *see also* Def.'s Brief at 44 (conceding that "Commerce does not deny that the import statistics may contain some prices from some companies that imported cartons into India by air"); Decision Memorandum at 65 (same). The ultimate effect, the Chinese Producers note, is that "[Commerce] is imputing [to] the Chinese respondents . . . the costs of specialty boxes and air freight charges they would not incur were they in India." Pls.' Brief at 40.

---

*Id.* The Chinese Producers conclude that, in effect, Commerce "is imputing the Chinese respondents with the costs of specialty boxes and air freight charges they would not incur were they in India." *Id.* According to the Chinese Producers, "[Commerce's] decision to value cartons using more expensive imports which were shipped by air" is thus not only "contrary to established practice" and "Court[] precedent," it is also contrary to "obvious business realities." *Id.*

Pointing to the Eximkey.com data, the Chinese Producers assert that "the great majority of the entries under HTS 4819.1010 cover boxes used for something other than packing, and other packing products, which bear no resemblance to the packing boxes used by [the respondents in this case]." *See* Pls.' Brief at 44. According to the Chinese Producers, the Eximkey.com data "unquestionably show that imports classified under HTS 4819.10.10 . . . contain a myriad of specialty products that inevitably inflate the average unit values of [the merchandise reflected in the Indian import statistics,] thereby distorting the surrogate values for cartons" used in Commerce's calculations here. *See* Pls.' Reply Brief at 12.

The Government seeks to discredit the Eximkey.com data, raising basically the same points that Commerce raised in the Final Results. *See* Def.'s Brief at 43-44 (*citing* Decision Memorandum at 64-65).[46] As the Chinese Producers observe, however, there is sound authority for the proposition that information (such as the Eximkey.com data here) which is used solely for purposes of (for lack of better terms) "corroboration" or "impeachment" need not necessarily meet the same standards as information relied on by Commerce to support its determinations. *See* Pls.' Reply Brief at 12-13 (*citing* Dorbest I, 30 CIT at 1698, 462 F. Supp. 2d at 1286 (explaining that, *e.g.*, "[r]egardless of whether or not Commerce finds it appropriate to use Infodrive India data to value mirrors, the

_____

[46]Specifically, the Eximkey.com data were reported in several different units of measure, which Commerce apparently could not compare directly to the Indian import statistics (which were reported on a per-kilogram basis). In addition, although Dong Yun had indicated that Eximkey.com data were available for only two months of the period of review (November 2003 and December 2003), Commerce was able to obtain Eximkey.com data for all months for the period January 2004 through October 2004. On the other hand, by the time Commerce sought to review the Eximkey.com data, only the data for 2004 and 2005 were still available on the website. Commerce was therefore unable to confirm the two months of Eximkey.com data (November and December 2003) that Dong Yun had provided. Finally, Commerce noted that Dong Yun keyed some data incorrectly. *See* Decision Memorandum at 64-65; *see also* Def.'s Brief at 43.

Infodrive India data can prove to be illuminating as to the nature of the product actually being valued within a specific . . . [tariff] subheading")).[47]

Even more to the point, as noted above, Commerce does not deny that the Indian import statistics for HTS subheading 4819.1010 included gift boxes, specialty boxes, and other non-packing cartons. *See*, *e.g.*, Decision Memorandum at 64 (conceding that "there are many different types of boxes covered by the Indian HTS category"). Nor could Commerce do so.

Instead, the Government's principal argument rests on Commerce's assertion (stated in its Final Results) that the gift and specialty boxes of concern to the Chinese Producers actually "are sourced from the PRC according to the import data," and have been excluded from the calculations because Commerce did not include imports from China, an NME country, in its surrogate value calculations. *See* Decision Memorandum at 64-65; Def.'s Brief at 43-44. As the Chinese Producers are quick to point out, however, Commerce "has supplied no details . . . demonstrating that the removal of PRC imports from the Indian import statistics eliminates the distortions caused by the inclusion of *other* specialty boxes within HTS [subheading] 4819.1010." *See* Pls.' Brief at 45-46 (emphasis added); *see generally* Dorbest I, 30 CIT at 1740 n.46, 462 F. Supp. 2d at 1320 n.46 (explaining that "if Commerce is going to use [Indian import statistics such as those here], it must (and did) accept the burden to ask the follow-up questions and conduct the analysis that such a choice will necessitate").[48]

_____

[47]*See also* Guangdong Chem., 30 CIT at 97, 414 F. Supp. 2d at 1312 (stating that "[a]lthough an agency is not required to comment on every submission it receives, a pertinent submission, such as Guangdong's corroborating evidence, should not be ignored").

[48]The Chinese Producers point out that, for example – even if gift and specialty boxes *from China* are excluded from Commerce's analysis – merchandise as diverse as "Federal Express

Further, the Chinese Producers take issue with Commerce's assertion that gift and specialty

boxes are largely sourced from mainland China.  The Eximkey.com data seem to indicate to the

contrary – that is, that the majority of gift and specialty boxes are in fact imported into India from

Taiwan.  *See* Pls.' Brief at 46.[49]  The Chinese Producers thus conclude that "the record evidence

packaging (from the U.S.), coffee advertising boxes (UAE [United Arab Emirates]), and cardboard
display materials (from Japan) continue to be included within the import statistics relied upon by
[Commerce]."  *See* Pls.' Brief at 46.

[49]Noting that the Chinese Producers did not raise the point in the administrative review
proceedings before Commerce, the Government contends that the doctrine of exhaustion of
administrative remedies bars the Chinese Producers from now arguing that the majority of gift boxes
are imported not from China, but – rather – from Taiwan.  *See* Def.'s Brief at 44 n.5.  The
Government's exhaustion argument fails for two reasons.

First, only in the Final Results did Commerce assert that gift and specialty boxes had
effectively been purged from the Indian import statistics by virtue of the agency's exclusion of data
on imports from China – which is the very point that the Chinese Producers seek to rebut by
focusing on the Eximkey.com data which seem to indicate that, to the contrary, the majority of such
boxes in fact are actually sourced from Taiwan.  *See* Decision Memorandum at 65 (stating that
"[W]e remove imports from the PRC from our calculation of a carton value from the Indian import
statistics because the PRC is an NME country.  Most of the gift and 'specialty boxes' referenced by
the [Chinese Producers] are sourced from the PRC according to the import data.  Therefore most of
the gift boxes and 'specialty boxes' . . . are already excluded from our calculations.").  In other
words, the Chinese Producers had no reason to raise its claim concerning Taiwan until *after*
Commerce made its argument in the Final Results, when Commerce, in effect, "opened the door"
on the issue of the origin of gift and specialty boxes.  Under such circumstances, the Chinese
Producers were not required to exhaust their remedies before the agency, because there was nothing
to exhaust.

Second, and in any event, the issue of whether to require the exhaustion of administrative
remedies in a case such as this is a matter committed to the sound discretion of the trial court.  *See*
AgroDutch Indus. Ltd. v. United States, 508 F.3d 1024, 1029 (Fed. Cir. 2007) (*citing* Corus Staal
BV v. United States, 502 F.3d 1370, 1381 (Fed. Cir. 2007)).

The Government also disputes the Chinese Producers' point on the merits, asserting that the
Eximkey.com data are "unreliable" and that "[the Chinese Producers'] claims that the Eximkey.com
data proved anything regarding the cartons in HTS § 4819.1010 [are thus] incorrect."  *See* Def.'s
Brief at 44 & n.5.  As discussed above, however, the Government is much too quick to dismiss the

indicates that the Indian import statistics continue to include gift boxes and other specialty packing

materials that are not used by respondents for shipping garlic." *Id*. at 45-46.[50]

Compounding the situation is the undisputed fact that – besides including gift and specialty

boxes and other products that "bear no resemblance to the packing boxes used by [the respondents]"

– the Indian import statistics provided by the domestic producers also include products that were

shipped by air. *See* Pls.' Brief at 40, 44, 47; Decision Memorandum at 65 (conceding that "the

Indian HTS category reflects" merchandise shipped by air, as well as other means); Def.'s Brief at

44 (admitting that "Commerce does not deny that the import statistics may contain prices from some

companies that imported cartons into India by air"). The effect of these air freight charges, the

Chinese Producers assert, is to further distort the Indian import statistics as a surrogate for the value

of the cartons actually used by the respondents in this case. *See* Pls.' Brief at 40, 45-47.

It is telling that Commerce and the Government have avoided directly confronting the

Chinese Producers' claims that air freight charges distort the Indian import statistics. The sum total

of Commerce's analysis of this point in the Final Results constitutes a mere three sentences: "Some

---

value of the Eximkey.com data for use in impeaching or corroborating data relied on by Commerce. *See*, *e.g.*, Dorbest I, 30 CIT at 1698, 462 F. Supp. 2d at 1286 (explaining that, *e.g.*, "[r]egardless of whether or not Commerce finds it appropriate to use Infodrive India data to value mirrors, the Infodrive India can prove to be illuminating as to the nature of the product actually being valued within a specific . . . [tariff] subheading").

[50]Just as examples to illustrate their point that "the great majority of entries under HTS 4819.1010 cover boxes used for something other than packing, and other packaging products, which bear no resemblance to the packing boxes used by the [respondents]," the Chinese Producers listed, *inter alia*, "Color envelopes," "10 kg boxes," "Inner shoe boxes," "Black potpourri box and lid," "DVD gift box/glue bay/polyform & logo," "Fedex bulk pack," "Vienna Luangchis Operation advise coffee box," "Cole Haan packing box with sleeves," and "Corrugated cardboard chest." *See* Pls.' Brief at 44; *see also* n.48, *supra* (identifying diverse sampling of other products included within Indian import statistics for HTS subheading 4819.1010).

companies may import cartons into the PRC by air, while others may not . . . .  This point alone,
however, does undermine the [agency's] rationale . . . .  Furthermore, the respondents have not
submitted any documents on the record of this review demonstrating that their own domestic carton
suppliers did not import the products into the PRC by air."  *See* Decision Memorandum at 65; *see
also* Def.'s Brief at 44.  Rather than grappling with the merits of the Chinese Producers' concerns
about the distortive effects of air freight charges on surrogate value, Commerce summarily dismissed
them:

> Mere allegations of facts, absent any record evidence for support of such claims,
> cannot be a basis for undermining the use of publicly available, contemporaneous
> valuation data from Indian HTS categories in this case.

Decision Memorandum at 65.

Conspicuously absent from the record, however, is any evidence to support Commerce's
suggestion that the Chinese Producers (or, for that matter, any other respondent) used packing
cartons that were *imported* – much less imported *by air*.[51]  Under the circumstances presented here,
Commerce's bare speculation cannot be sustained.  For reasons set forth above (*see* n.45, *supra*),
"the preference for domestic data is most appropriate where [ – as here – ] the circumstances indicate
that a producer in a hypothetical market would be unlikely to use an imported factor in its production
process."  Hebei Metals, 29 CIT at 300, 366 F. Supp. 2d at 1274.

In the present case, the Chinese Producers reason that "Indian garlic companies have no
reason to buy more expensive imported boxes if these can be supplied domestically," noting that

---

[51]In the Final Results, Commerce acknowledged that the respondents domestically source
the cartons that they use to pack and ship their garlic.  *See*, *e.g.*, Decision Memorandum at 65
(acknowledging the respondents' "own domestic carton suppliers"); Pls.' Brief at 40 (noting that the
Chinese Producers "source their packing boxes domestically").

"[t]he same is true in China; [the Chinese Producers] source their packing boxes domestically." Pls.'
Brief at 40. Here, much as in Yantai, the record is simply devoid of any indication as to why the
respondents would have used *imported* packing cartons (much less cartons imported *by air*), when
such basic packaging materials were available domestically. *See* Yantai Oriental Juice Co. v. United
States, 26 CIT 605, 617 (2002) (*citing* Nation Ford, 166 F.3d at 1376); *see also* Pls.' Brief at 40.
Commerce here has failed to reasonably approximate the carton cost incurred by a surrogate Indian
garlic producer, and thus, has not created an accurate hypothetical market.

Commerce's carton valuation analysis in this case suffers from the same basic kinds of
infirmities as its carton valuation analysis in the eighth administrative review. *See generally* Jinan
Yipin, 31 CIT at ____, 526 F. Supp. 2d at 1376-79. The court there faulted Commerce for, *inter
alia*, failing to adequately address "trade intelligence data" provided by the respondents which
"indicate[d] that the tariff subheading [used in the import statistics on which Commerce there relied]
is quite broad in scope." *Id*., 31 CIT at ____, 526 F. Supp. 2d at 1378. The court criticized
Commerce's dismissive treatment of the trade intelligence data, and found that the data provided
support for "the court's conclusion that Commerce's valuation decision is unsatisfactory on [the
existing] record because it is based on import data that are not reasonably representative of [the
respondents'] packing cartons." *Id*., 31 CIT at ____, 526 F. Supp. 2d at 1378. The court similarly
criticized Commerce for its rejection of Indian box prices proffered by the respondents, which the
agency found were (among other things) "not representative of a range of prices during the period
of review," and which the Government argued were "not derived from a public source." *Id*., 31 CIT
at ____, 526 F. Supp. 2d at 1379. As the court there emphasized, however, "[t]he price quotes . .

. are vastly superior to the Indian import data in an important respect: they are specific to the factor being valued." *Id.*, 31 CIT at ____, 526 F. Supp. 2d at 1379. The court therefore remanded the matter to Commerce:

> Because the data used by Commerce to calculate the surrogate value were not reasonably representative of [the respondents'] cartons and yielded a calculated result that was more than three times higher than the price quotes, the court cannot conclude that Commerce used the "best available information" or that it supported its choice with record evidence or adequate reasoning.

*Id.*, 31 CIT at ____, 526 F. Supp. 2d at 1379 (*quoting* 19 U.S.C. § 1677b(c)(1)). The same result must obtain in this case.

In short, as in <u>Jinan Yipin</u>, it appears that Commerce here *overstated* any *potential* concerns as to the reliability of the domestic Indian box prices that the agency rejected, at the same time that the agency significantly *understated* the *patent* flaws and defects in the Indian import statistics on which the agency relied. As the Chinese Producers put it, Commerce "failed to explain how [the seemingly] non-representative import data is the 'best available information' when domestic data on the record represent[] the *exact type of product* used by the respondents and actual domestic market prices for that input." *See* Pls.' Reply Brief at 13 (emphasis added). Nor did Commerce support its selection of the Indian import statistics by reference to substantial evidence in the record. Commerce's determination on this matter therefore cannot be sustained. This issue too must be remanded for further consideration.

## F.  Plastic Jar Valuation

The Chinese Producers similarly take issue with the surrogate value that Commerce assigned for the plastic jars used to pack the respondents' peeled garlic. *See generally* Pls.' Brief at 47-49;

Pls.' Reply Brief at 11-13.  As with packing cartons, the Chinese Producers argue that Commerce erred in using the Indian import data provided by the domestic producers as the basis for the surrogate value for plastic jars.  According to the Chinese Producers, the Indian import statistics "are . . . flawed in two different ways; [1] the products imported under [the selected HTS subheading] are not sufficiently similar to the merchandise actually used by the . . . respondents, and [2] the values [of imported merchandise included within the selected HTS subheading] are distorted by the inclusion of [air] freight charges."  The Chinese Producers maintain that Commerce therefore should have selected a surrogate value derived from the domestic Indian jar prices that they submitted for the agency's consideration.  *See generally* Pls.' Brief at 47-49; Pls.' Reply Brief at 11, 13.

Like the domestic Indian box prices that the Chinese Producers provided, the domestic Indian price quotes that the Chinese Producers submitted for plastic jars were not without their flaws.  However, notwithstanding the problems with those price quotes, Commerce failed to adequately explain and support its determination that the Indian import statistics were the best information available.

In prior administrative reviews, Commerce had valued plastic jars using a figure derived from Indian import statistics for HTS subheading 3923.3000, which covered "Carboys, Bottles, Flasks, and Similar Articles of Plastics, Nesoi."  *See* Pls.' Brief at 47 & n.12; Def.'s Brief at 46; Ninth Garlic Review Memorandum, 2005 WL 2290660, at comment 8.  However, in the period of review at issue here, that HTS subheading was no longer valid.  *See* Pls.' Brief at 47 n.12.

The domestic producers placed on the record of this review Indian import statistics for HTS subheading 3923.3090, covering "Carboys, Bottles, Flasks, and Similar Articles of Plastics." Def.'s

Brief at 46-47.  The Chinese Producers, in turn, submitted four price quotes obtained from three different Indian vendors of plastic jars.  *See* Decision Memorandum at 66-67; Pls.' Brief at 48; *see also* Respondents' Surrogate Value Submission (Pub. Doc. No. 81), Exh. 21.

In the Preliminary Results, Commerce rejected the domestic Indian jar prices, and instead relied on the Indian import data provided by the domestic producers.  *See* Decision Memorandum at 68; Preliminary Results, 70 Fed. Reg. at 69,950; Preliminary Factors Valuation Memorandum (Pub. Doc. No. 400), at 14-16.  Thereafter, the Chinese Producers submitted additional information to Commerce, from Infodrive India,[52] which indicated that the Indian import data for HTS subheading 3923.3090 covered a very broad range of products, including "specialty jars" and other "plastic products completely different from the plastic jars used by the [Chinese Producers] to pack . . . peeled garlic," such as "slippers," "hairdressing accessories," "fibre glass," and "disposable plasticware."  *See* Decision Memorandum at 66; Pls.' Brief at 48-49; Pls.' Reply Brief at 11-13.

In the Final Results, Commerce nevertheless continued to rely upon the Indian import data provided by the domestic producers, rather than using the domestic Indian jar prices submitted by the Chinese Producers.  *See* Decision Memorandum at 66-69.  Commerce's grounds for rejecting the domestic Indian jar prices largely paralleled its grounds for rejecting the domestic Indian box prices (discussed in the immediately preceding section).  *See id.*; section III.E, *supra* (discussing surrogate value for cartons).

---

[52]In the Final Results, Commerce described Infodrive India as "a service that provides, among other things, descriptions of the items included in Indian import HTS categories."  *See* Decision Memorandum at 68; *see also* Zhejiang, 32 CIT at ____ n.7, 2008 WL 2410210 at * 6 n.7 (describing Infodrive India as a source that "compile[s] and disseminate[s] official import statistics").

As with the domestic Indian box prices, Commerce stated that the domestic Indian jar prices did not "meet the criteria for public availability . . . that the Department relies upon when choosing appropriate surrogate values in order to decrease the possibility of price manipulation of documents prepared specifically for use in antidumping proceedings." Decision Memorandum at 66; *see also* Def.'s Brief at 47. Commerce noted pointedly that "no detail on the identity of the party that requested the prices, or information as to whether or not an affiliation existed between the requester and the Indian companies, was ever placed on the record." Decision Memorandum at 67; *see also* Def.'s Brief at 47.

On the other hand, the Chinese Producers correctly observe that it is equally true that Commerce did not cite even a scintilla of evidence of manipulation or distortion or affiliation to cast doubt on the reliability of the domestic Indian jar prices. *See* Pls.' Reply Brief at 13. As with Commerce's rejection of the domestic Indian box prices, the Chinese Producers contend that – in the absence of any such evidence – Commerce is, in effect, improperly *presuming* that the domestic Indian jar prices were corrupted. And, as the Chinese Producers have noted, Commerce is generally precluded from predicating agency determinations "on nothing but unfounded speculation." *See* section III.E, *supra* (and authorities and sources cited there).

Further, as the Chinese Producers have underscored, Commerce's preference for publicly available information is simply a preference, which can never "trump" the agency's overarching obligation under the statute – to use the best available information to calculate dumping margins as accurately as possible. *See* Pls.' Brief at 42-43 (and authorities cited there); *see generally* section III.E, *supra*. The Chinese Producers charge that Commerce in this case is guilty of a "myopic focus

on the 'public availability' of . . . Indian import statistics while disregarding the more basic inquiry,

namely, can the use of this surrogate source [*i.e.*, the Indian import statistics] lead to the calculation

of an accurate dumping margin?"  Pls.' Reply Brief at 11.  According to the Chinese Producers,

"[w]here, as here, those import statistics are proven to be distorted by products such as . . . specialty

jars which are not the products used by any respondent in this review, the answer is unequivocally

no."  *Id.*[53]

The Chinese Producers thus maintain not only that the domestic Indian jar prices reflect

---

[53]In addition to its asserted reservations as to the reliability of the domestic Indian jar prices (discussed above), Commerce also identified several other concerns vis-a-vis those price quotes.

First, Commerce noted that "two of the four price quotes actually fall outside of the [period of review]."  Decision Memorandum at 67; *see also* Def.'s Brief at 47.  Commerce further stated that "even the [two] contemporaneous price quotes" did not "cover a substantial time period throughout the [period of review]," and could thus "be subject to temporary market fluctuations."  Decision Memorandum at 67; *see also* Def's Brief at 47.  In addition, Commerce pointed out that "[t]wo of the four price quotes do not indicate whether lids are included in the submitted price," and that "[t]he remaining two price quotes, which clearly include the price of the lid, do not separate between the price of the lid and the price of the jar."  Decision Memorandum at 68; *see also* Def.'s Brief at 47.  In light of this fact, Commerce noted that it "would not have a separate price to use for either jars or lids for those respondents for which only one of these factors is valued with a surrogate value in [the agency's] calculations," which would "further impede[] [the agency's] use of these submitted values."  Decision Memorandum at 68; *see also* Def.'s Brief at 47.

No doubt these points diminish, at least, to some degree, the utility of the domestic Indian jar prices.  But the fact that domestic data provided by a respondent are not perfect does not necessarily warrant the rejection (in whole or in part) of those data.  Nor do flaws in such data automatically justify resort to import statistics which suffer from *other* flaws.  *See also*, *e.g.*, Hebei Metals, 29 CIT at 301, 366 F. Supp. 2d at 1275 (explaining that, "[w]hile the contemporaneity of data is one factor to be considered by Commerce . . . , three months of contemporaneity is not a compelling factor where the alternative data is only a year-and-a-half distant from the [period of investigation]"; moreover, contemporaneity is "insufficient to explain why an import price is the best available information for establishing the actual costs incurred by a producer"); Dorbest I, 30 CIT at 1695 n.14, 462 F. Supp. 2d at 1284 n.14 ("contemporaneity, in and of itself[,] should not be viewed as the sole reason to discard data; rather the quality of the data needs to be viewed in its totality").

"domestic, product specific surrogate data," including "actual domestic market prices," for "plastic jars with similar characteristics and dimensions to the plastic jars" that the Chinese Producers actually use to pack their peeled garlic, but – moreover – that the Indian import statistics relied on by Commerce are so distorted both by "a myriad of specialty products" that "are not remotely representative of the plastic jars used by the [Chinese Producers]" and by air freight charges that the surrogate value derived from the import statistics can only be described as "aberrational." *See* Pls.' Brief at 47-49; Pls.' Reply Brief at 12-13.

As an initial matter, the Chinese Producers point out that, as detailed in section III.E above, there is a preference – all other things being equal – for Commerce's use of domestic data, rather than import statistics such as those relied on by the agency in this case. *See* Pls.' Brief at 49; Pls.' Reply Brief at 13; *see generally* section III.E, *supra* (and authorities cited there).[54]

Besides pointing to the well-established, general preference for the use of domestic data (rather than import statistics), the Chinese Producers also attack the use of import statistics here on fundamentally the same two case-specific grounds that they invoked in challenging the use of import statistics for the surrogate value for cartons.

First, the Chinese Producers note, it is "irrefutable" that HTS subheading 3293.3090 (the subheading for which Commerce has Indian import statistics) is a "broad, basket" tariff provision which captures an extraordinarily wide range of plastic products, above and beyond the very basic

---

[54]Section III.E above outlines some of the compelling policy considerations and commercial realities that undergird the strong preference favoring Commerce's use of domestic data over import statistics, all other things being equal. *See generally*, *e.g.*, Hebei Metals, 29 CIT at 299, 366 F. Supp. 2d at 1273 *et seq*. ("A domestic price is preferred for the calculation of surrogate values by prior practice, policy, and logic.").

plastic jars that the respondents used to pack garlic. *See* Pls.' Brief at 48; *see also id*. at 47, 49; Pls.' Reply Brief at 11-13. The Chinese Producers argue that the merchandise reflected in the Indian import statistics is thus not representative of, or sufficiently specific to, the product being valued by the surrogate (*i.e.*, the plastic jars that the respondents actually used). *See* Pls.' Reply Brief at 13.

And, second, the Chinese Producers note that it is also undisputed that the Indian import statistics include certain air freight charges, which – according to the Chinese Producers – further distort the average unit price reflected in the Indian import statistics. *See* Pls.' Brief at 47-49; *see also* Def.'s Brief at 48 (acknowledging that "HTS § 3923.3090 includes some prices that are inclusive of airfreight," and that "the Indian import statistics . . . include the freight experience of those importers that used or did not use air freight"); Decision Memorandum at 68-69 (same). The Chinese Producers therefore conclude that "it is particularly appropriate to use domestic surrogate data . . . in this case, given that the import data is distorted by air freight charges, and other products, such as 'slippers,' 'hairdressing accessories,' 'fibre glass,' and 'disposeable plasticware.'" Pls.' Brief at 49.

In addition to the language of the tariff provision itself, the Chinese Producers also point to the Infodrive India data to establish on the record that HTS subheading 3923.3090 "is distorted by plastic products that do not resemble at all the plastic jars used by the [Chinese Producers]." *See* Pls.' Brief at 48. To highlight their point, the Chinese Producers note that, *inter alia*, the Infodrive India data indicate that "the highest quantity of imports . . . driv[ing] the price of [merchandise classified under HTS subheading 3923.3090] is imported from Italy by L'Oreal India Pvt. and is described as 'hair products.'" *Id*. According to the Chinese Producers, the effect of the "myriad

specialty products" classified under HTS subheading 3923.3090 is to "inevitably inflate the average unit values [of the merchandise reflected in the Indian import statistics] thereby distorting the surrogate value[] for . . . jars." *See* Pls.' Reply Brief at 12.

Much as they sought to discredit the Eximkey.com data in their analysis of cartons, so too Commerce and the Government have sought to dismiss the Infodrive India data here. *See generally* Decision Memorandum at 68; Def.'s Brief at 48. First, Commerce noted that, while the Indian import statistics report data on a kilogram basis, the Infodrive India data were not "consistently reported on a weight basis." Decision Memorandum at 68. According to Commerce, "[w]ithout the conversion factor to convert the reported [Infodrive India] unit types to a kilogram basis," the agency could not confirm "[the] respondents' contention that [the merchandise classified under HTS subheading 3923.3090] is dominated by hair products." *Id.*[55] In addition, Commerce expressed concern that it "[could not] determine the method by which respondents selected only twelve [entries]" out of the "650 records available for the HTS category" for the "ten months of the [period of review]" for which data were available through Infodrive India. *Id.*

_____

[55]It is unclear why Commerce seized solely on the respondents' statements concerning the dominance of "hair products" in the statistics for HTS subheading 3923.3090, to the exclusion of any broader implications of the Infodrive India data, and ignored any light that those data might otherwise shed on the scope of the tariff subheading.

Moreover, while – absent the referenced "conversion factor" – it may (or may not) have been impossible for Commerce to verify that "hair products" *dominate* the HTS subheading, the Infodrive India data in any event were not "meaningless." *Compare* Decision Memorandum at 68. Whether or not Commerce could verify the respondents' specific quantitative statements, the Infodrive India data nevertheless stand as unrefuted, concrete evidence of non-representative merchandise captured by the Indian import statistics on which Commerce seeks to rely. *See generally* Dorbest I, 30 CIT at 1695-98, 462 F. Supp. 2d at 1284-86 (rejecting various similar arguments made by Commerce in attempt to justify refusal to use Infodrive India data).

As discussed in section III.E above, however, information that is used for purposes such as corroboration or impeachment – such as the Infodrive India data here – need not necessarily meet the same standards as information that Commerce relies on to support its determinations. *See* Pls.' Reply Brief at 12-13 (*citing* Dorbest I, 30 CIT at 1698, 462 F. Supp. 2d at 1286 (explaining that, *e.g.*, "[r]egardless of whether or not Commerce finds it appropriate to use Infodrive India data to value mirrors, the Infodrive India data can prove to be illuminating as to the nature of the product actually being valued within a specific . . . [tariff] subheading")).

And, more fundamentally – whatever may be the shortcomings of the Infodrive India data – the fact remains that neither Commerce nor the Government have even attempted to deny that the Indian import statistics for HTS subheading 3923.3090 included a very broad spectrum of other products, in addition to basic plastic jars. Nor could they reasonably deny it. Instead, distilled to its essence, their argument on this point amounts to little more than a claim that Commerce cannot accurately ascertain from the existing record the full *extent* of the distortion attributable to the broad scope of the tariff subheading. *See* Decision Memorandum at 68 (stating that "[w]ithout the conversion factor to convert the reported unit types to a kilogram basis, respondents' contention that the HTS category is dominated by hair products is meaningless because the quantities noted for hair products are in pieces"); *see also* Def.'s Brief at 48.[56]

---

[56]As detailed in section III.E above, the parties similarly dispute the surrogate value for cartons, where a major issue is the Chinese Producers' concern that the relevant tariff subheading used in the Indian import statistics captured, *inter alia*, gift boxes and specialty boxes that are not representative of the basic packing cartons that the respondents used to pack and ship garlic. *See generally* section III.E, *supra*.

There, Commerce evidently made some effort to cure (or at least minimize) the problem of non-representative merchandise captured in the import statistics on which the agency seeks to rely.

Similarly, Commerce and the Government concede – as they must – that the Indian import statistics reflect entries of merchandise that included air freight charges. *See* Def.'s Brief at 48 (acknowledging that "HTS § 3923.3090 includes some prices that are inclusive of airfreight," and that "the Indian import statistics . . . include the freight experience of those importers that used or did not use air travel"); Decision Memorandum at 68-69 (same). Much like the Indian import statistics used for the surrogate value of cartons, the Chinese Producers assert that the effect of such air freight charges is to further distort the Indian import statistics as a surrogate for the value of the jars actually used by the respondents in this case. *See* Pls.' Brief at 47-49.

Just as Commerce and the Government do not directly confront the Chinese Producers' assertions that the air freight charges have the effect of distorting the Indian import statistics used to value cartons, so too Commerce and the Government do not directly address the Chinese Producers' claim here. Like its analysis of cartons, Commerce's analysis of this point vis-a-vis jars is a terse three sentences in the Final Results: "Some companies import jars and lids into the PRC by air, others do not, and the Indian HTS category reflects all of these experiences. This point alone, however, does not supersede the fact that [the Indian import statistics are] the most contemporaneous and accurate surrogate on the record. Furthermore, the respondents have not submitted any documents on the record of this review demonstrating that their own domestic plastic jar and lid suppliers did not import the products into the PRC by air." Decision Memorandum at 68-69; *see also* Def.'s Brief at 48-49. Again, as with packing cartons, rather than squarely responding to the

_____

*See* Decision Memorandum at 64-65 (where Commerce asserts that gift and specialty boxes are sourced primarily from China, and that agency excluded Chinese imports from the import statistics that it used). In stark contrast, Commerce has made no such effort here.

merits of the Chinese Producers' concerns about the distortive effects of air freight charges on the

surrogate value of plastic jars, Commerce simply dismissed those concerns (using the exact same

words it used to dismiss the Chinese Producers' concerns about cartons):

> Mere allegations of facts, absent any record evidence for support of such claims,
> cannot be a basis for undermining the use of publicly available, contemporaneous
> valuation data from HTS categories in this case.

Decision Memorandum at 69.

Here too, however – as with cartons – the record seems to be devoid of any actual evidence

to support Commerce's suggestion that the Chinese Producers (or any respondent) used plastic jars

that were *imported*, much less imported *by air*.[57] And, as with cartons, Commerce's bare speculation

cannot be sustained.

The Chinese Producers emphasize that Indian garlic producers have no reason to buy more

expensive imported jars, noting that "if the [respondents] were in [India] they would purchase the

plastic jars domestically" (just as the respondents domestically sourced the actual jars that they used

for their garlic produced in China). Pls.' Brief at 49. As in Yantai, the record in this case is simply

silent as to any reason why the respondents would have used *imported* plastic jars (much less jars

imported *by air*), when such a basic product was available domestically. *See* Yantai, 26 CIT at 617

(citation omitted). As explained in greater detail in section III.E above, "the preference for domestic

data is most appropriate where [– as here –] the circumstances indicate that a producer in a

hypothetical market would be unlikely to use an imported factor in its production process." Hebei

---

[57]In the Final Results, Commerce acknowledged that the respondents domestically sourced
the plastic jars that they used to pack their peeled garlic. *See*, *e.g.*, Decision Memorandum at 69
(referring to the respondents' "own domestic plastic jar and lid suppliers").

Metals, 29 CIT at 300, 366 F. Supp. 2d at 1274.

In sum, just as it appears that Commerce overstated its concerns as to the reliability of the domestic box prices at the same time that it significantly understated the obvious infirmities in the Indian import statistics on which it relied in determining a surrogate value for packing cartons, so too it appears that Commerce has done the same thing vis-a-vis the agency's valuation of plastic jars. In the words of the Chinese Producers, Commerce "failed to explain how [the seemingly] non-representative import data is the 'best available information' when domestic data on the record represent[] the exact type of product used by the respondents and actual domestic market prices for that input." *See* Pls.' Reply Brief at 13. Nor did Commerce support its selection of the Indian import statistics by reference to substantial evidence in the record.

Like Commerce's determination on the surrogate value for cartons, Commerce's determination on this matter cannot be sustained. And, like Commerce's determination on the surrogate value for cartons, this issue also must be remanded for further consideration.

G. Certain Labor-Related Expenses

The Chinese Producers' final challenge is to Commerce's treatment of certain labor-related expenses. Specifically, the Chinese Producers contend that Commerce improperly included "provident fund" and "gratuity" expenses as part of manufacturing overhead in the agency's calculation of normal value. *See generally* Pls.' Brief at 49-56; Pls.' Reply Brief at 13-15.

The Chinese Producers' challenge turns on whether provident fund and gratuity expenses were already reflected in Commerce's calculations (through the surrogate labor rate), such that those expenses should not have been separately accounted for elsewhere (specifically, in manufacturing

overhead). As discussed below, there is nothing in the record to indicate that provident fund expenses in fact were already reflected in Commerce's calculations. Moreover, the record makes it clear that any potential double counting associated with Commerce's treatment of gratuities had no effect whatsoever on the overall calculation of overhead expenses. The Chinese Producers' challenge to Commerce's treatment of provident fund and gratuity expenses therefore must fail.

When constructing normal value for NME country merchandise, Commerce bases its determination on "the value of the factors of production utilized in producing the merchandise." 19 U.S.C. § 1677b(c)(1). However, the surrogate values of the factors of production do not capture certain costs and expenses, including manufacturing overhead (which is at issue here), as well as selling, general, and administrative ("SG&A") expenses, and profit costs. Commerce therefore calculates separate values for those items (using "surrogate financial ratios" based on the financial statements of one or more market economy companies that produce identical or comparable merchandise),[58] and adds those values to the surrogate values of the factors of production. *See* 19 C.F.R. § 351.408(c)(4); 19 U.S.C. § 1677b(c)(1)(B); *see generally* Dorbest I, 30 CIT at 1715-16, 462 F. Supp. 2d at 1300-01.[59]

As discussed in section III.C above, Commerce here based its surrogate labor rate

---

[58]The "surrogate financial ratio" reflects a percentage of overhead, SG&A, and profit expenses (which constitute the numerator) relative to the surrogate company's sum of materials, labor, and engery costs ("MLE") (which constitutes the denominator). *See* Dorbest I, 30 CIT at 1715 n.36, 462 F. Supp. 2d at 1301 n.36.

[59]The statute specifies that, if the available information does not permit calculation of normal value pursuant to 19 U.S.C. § 1677b(a), Commerce "shall determine the normal value of the subject merchandise on the basis of the value of the factors of production utilized in producing the merchandise and *to which shall be added an amount for general expenses and profit plus the cost of . . . other expenses*." 19 U.S.C. § 1677b(c)(1)(B) (emphasis added).

calculations on data from the International Labour Organization ("ILO") Yearbook of Labour Statistics. *See also*, *e.g.*, Allied Pacific II, 32 CIT at ____, 587 F. Supp. 2d at 1339; Dorbest I, 30 CIT at 1707, 462 F. Supp. 2d at 1294. In the past (and in the Preliminary Results in this case), Commerce presumed that many employee benefits were included within the surrogate values for direct wage rates (through the ILO's reported direct wage rates), and thus were included as part of Materials, Labor, and Energy ("MLE") in the denominator of the surrogate financial ratio. *See* Decision Memorandum at 69-70; Preliminary Results, 70 Fed. Reg. at 69,950-51. But Commerce analyzed that issue more closely in its January 2006 determination in Tables and Chairs from the PRC, and announced a change from its past practice. *See* Folding Metal Tables and Chairs from the People's Republic of China; Final Results of Antidumping Duty Administrative Review, 71 Fed. Reg. 2905 (Jan. 18, 2006); Issues and Decision Memorandum for the Final Results of Folding Metal Tables and Chairs from the People's Republic of China, 2006 WL 158633 (Jan. 18, 2006) ("Tables and Chairs from the PRC"), at comment 1B.

In Tables and Chairs from the PRC, Commerce explained that the ILO's Yearbook of Labour Statistics distinguishes between "Chapter 5 Wages" (essentially, direct wages) and "Chapter 6 Labor Costs" (essentially, employee benefits). Consistent with the ILO's treatment of employee benefits, Commerce indicated that it would begin looking to surrogate financial statements, and – where line items in the financial statements identified labor costs that *were not* included in direct wage payments – those labor costs would be included in overhead expenses. Commerce also indicated generally that it would otherwise treat an employee benefit as an overhead expense if the benefit fell under the ILO's definition of a "Chapter 6 Labour Cost." *See generally* Tables and Chairs from the

PRC, 2006 WL 158633, at comment 1B.

In March 2006, Commerce sent the parties to this administrative review a letter (the "Surrogate Financial Ratios Letter"), giving notice of the agency's intent to treat certain labor-related expenses as announced in Tables and Chairs from the PRC, and inviting the parties' comments. In particular, to the extent relevant here, Commerce advised that it planned to include "provident fund" and "gratuity" expenses in manufacturing overhead (*i.e.*, in the numerator of the surrogate financial ratio), based on Commerce's conclusion that those expenses were not already reflected in the rate used to calculate the surrogate value for labor. *See generally* Decision Memorandum at 69; Surrogate Financial Ratios Letter (Pub. Doc. No. 440).

The Chinese Producers filed comments objecting to the proposed change in methodology, arguing – in essence – that Commerce was in error in concluding that "the expected NME hourly wage rate calculation does not include benefits." *See* Respondents' Comments on Proposed Ratio Recalculations (Pub. Doc. No. 446); Decision Memorandum at 69-70. Specifically, the Chinese Producers noted that "wage rates" and "earnings" are two distinct terms defined differently in the Preamble to Chapter 5 of the ILO Yearbook of Labour Statistics, which provides the source data used by Commerce in its surrogate labor rate calculation. *See* Respondents' Comments on Proposed Ratio Recalculations.

The Chinese Producers' comments quoted the Preamble to Chapter 5 of the Yearbook, emphasizing that it defines "[e]arnings" to include "bonuses and gratuities" (albeit only if they are "paid by the employer directly to [the] employee"):

> 10.    (i) Earnings should include: direct wages and salaries [as defined in subparagraph (a)], remuneration for time not worked (excluding

severance and termination pay) [as defined in subparagraph (b)], [and] *bonuses and gratuities and housing and family allowances paid by the employer directly to this employee* [as defined in subparagraph (c)].

(a) Direct wages and salaries for time worked, or work done, cover: (i) straight time pay of time-related workers; (ii) incentive pay of time-related workers; (iii) earnings of piece workers (excluding overtime premiums); (iv) premium pay for overtime, shift, night and holiday work; (v) commissions paid to sales and other personnel. Included are: premiums for seniority and special skills, geographical zone differentials, responsibility premiums, dirt, danger and discomfort allowances, payments under guaranteed wage systems, cost-of-living allowances and other regular allowances.

(b) Remuneration for time not worked comprises direct payments to employees in respect of public holidays, annual vacations and other time off with pay granted by the employer.

(c) *Bonuses and gratuities cover seasonal and end-of-year bonuses, additional payments in respect of vacation period* (*supplementary to normal pay*) *and profit-sharing bonuses.*

(ii) Statistics of earnings should distinguish cash earnings from payments in kind.

Respondents' Comments on Proposed Ratio Recalculations (*quoting* ILO Yearbook, Preamble to Chapter 5) (emphases by the Chinese Producers).

The Chinese Producers' comments contrasted the definition of "earnings" in the Preamble to Chapter 5 (quoted above) with the Preamble's definition of "wage rates" (which expressly excludes "bonuses and gratuities," as well as "family allowances and other social security payments made by employers"):

12.     Wage rates should include basic wages, cost-of-living allowances and other guaranteed and regularly paid allowances, but exclude overtime payments, bonuses and gratuities, family allowances and other social security payments made by employers. *Ex gratia* payments in kind,

supplementary to normal wage rates, are also excluded.

Respondents' Comments on Proposed Ratio Recalculations (*quoting* ILO Yearbook, Preamble to Chapter 5).

The Chinese Producers' comments emphasized that, according to the Preamble, "'[t]he statistics of wages presented in tables 5A and 5B are in general, *average earnings* per worker.'" *See* Respondents' Comments on Proposed Ratio Recalculations (*quoting* ILO Yearbook, Preamble to Chapter 5) (emphasis by the ILO). Read in concert, the Chinese Producers argued, the quoted excerpts from the Preamble to Chapter 5 of the ILO Yearbook establish that the surrogate labor rate – calculated by Commerce using the Chapter 5B tables (which reflect "earnings") – "specifically *includes* gratuities and staff welfare benefits for both family and housing allowances." *See* Respondents' Comments on Proposed Ratio Recalculations. The Chinese Producers asserted that those labor expenses were "therefore . . . included in the Materials, Labor, Energy ("MLE") denominator for the surrogate ratios," and argued that "adding [the expenses] to factory overhead would result in an impermissible double counting . . . , since [the expenses] are already included in the surrogate labor rate." *Id.*

Commerce compared the ILO Yearbook statistics with the respondents' reported factors of production and the surrogate financial statements, and, in the Final Results, rejected the Chinese Producers' arguments as to provident fund and gratuity expenses, concluding that those expenses should be treated as overhead. *See* Decision Memorandum at 71-73. In reaching its conclusion, Commerce relied on Chapter 5 of the ILO Yearbook, which the agency uses to calculate its wage rate. *See* Decision Memorandum at 71-72. Commerce noted that Chapter 5, "Wages," expressly

defines "earnings" (as that term is used in wage statistics) to specifically *exclude* benefits such as

"social security and pension scheme[]" payments and benefits:

> The concept of earnings, as applied in wages statistics, relates to remuneration in cash and in kind paid to employees, as a rule at regular intervals, for time worked or work done together with remuneration for time not worked, such as for annual vacation, other paid leave or holidays. *Earnings exclude employers' contributions in respect of their employees paid to social security and pension schemes and also the benefits received by employees under these schemes*. Earnings also exclude severance and termination pay.

Decision Memorandum at 71 (*quoting* ILO Yearbook, Chapter 5) (emphasis added).

Commerce contrasted the definition of "earnings" quoted above – from Chapter 5 ("Wages")

of the Yearbook – with the definition of "labour cost" from Yearbook Chapter 6 ("Labour Costs"),

which makes it clear that "labour cost[s]" include employee benefits such as "employers' social

security expenditures":

> For the purposes of labour cost statistics, labour cost is the cost incurred by the employer in the employment of labour. *The statistical concept of labour cost comprises* remuneration for work performed, payments in respect of time paid for but not worked, bonuses and gratuities, the cost of food, drink and other payments in kind, cost of workers' housing borne by employers, *employers' social security expenditures*, cost to the employer for vocational training, welfare services and miscellaneous items, such as transport of workers, work clothes and recruitment, together with taxes regarded as labour cost.

Decision Memorandum at 71-72 (*quoting* ILO Yearbook, Chapter 6) (emphases added).

In the Final Results, Commerce found that provident fund expenses were not included in its

wage rate calculation and thus needed to be captured in the agency's calculation of overhead

expenses, in order to accurately determine normal value. *See* Decision Memorandum at 72.

Commerce explained:

> *It is clear that the wages category (Chapter 5) is exclusive of employee benefits such*

*as pension and social security*, while the labor cost category (Chapter 6) is inclusive of these employee expenses . . . . [Commerce] based its calculation of the regression-based expected PRC wage rate on data from Chapter 5B of the [Yearbook of Labour Statistics]. In the instant review, the detailed and well-defined surrogate financial data permitted [Commerce] to easily segregate labor expenses into "Wages" (which corresponds to Chapter 5B of the ILO database and, therefore, to [Commerce's] expected NME wage rate), and the other aforementioned labor costs (which are not included in [Commerce's] calculated NME wage rate). Accordingly, to be consistent with the methodology employed in calculating the expected PRC wage rate, we have determined that it is appropriate in the instant review to include these employee benefit categories in factory overhead in order to ensure that they are captured in our calculation of normal value.

Decision Memorandum at 72 (emphasis added).[60]

On the other hand, Commerce acknowledged that, as to two of the five financial statements used in its calculations, treating gratuities as an overhead expense *might* result in "double counting." *See* Decision Memorandum at 72-73. But Commerce found that removing gratuities from overhead expenses for those two financial statements (to preclude any potential for double counting) resulted in merely "a one hundredth of a percent change in the overhead ratios" for those statements, and that – when the overhead ratios for those two statements were averaged with the overhead ratios from the remaining three financial statements – it made no difference whatsoever "in the overall calculation of the overhead ratio." Decision Memorandum at 72-73. Commerce therefore

---

[60]On these grounds, Commerce explained its decision to include both "staff welfare" expenses and "provident fund" expenses in manufacturing overhead. *See* Decision Memorandum at 72. However, the Chinese Producers have not sought to contest Commerce's treatment of staff welfare expenses in this action. The Chinese Producers' challenge here is confined to Commerce's treatment of provident fund and gratuity expenses. *See*, *e.g.*, Pls.' Brief at 53 (challenging Commerce's treatment of "provident fund and gratuities expenses"), 54 (asserting that agency "decision to remove provident fund and gratuities cannot be upheld"), 55 (arguing that agency "inclusion of the provident fund and gratuity expenses as part of overhead constitutes impermissible double-counting"), 56 (challenging agency "inclusion of both provident fund and gratuities as part of overhead").

concluded that the effect was insignificant under the statute. *See* Decision Memorandum at 72-73 (*citing* 19 U.S.C. § 1677f-1(a)(2)).[61]

The Chinese Producers here reprise their objection to the treatment of provident fund expenses, first advanced in the administrative proceeding. As set forth more fully above, the Chinese Producers' argument – in a nutshell – is that the definition of "earnings" includes "bonuses and gratuities and housing and family allowances," and (implicitly) that provident fund expenses are some form of "bonuses and gratuities and housing and family allowances." *See* Pls.' Reply Brief at 14; *see also* Pls.' Brief at 53-54.[62] The Chinese Producers conclude that, because the surrogate labor rate already includes "earnings," the effect of including provident fund expenses in overhead is impermissible "double counting." *See* Pls.' Brief at 53-55; Pls.' Reply Brief at 13-14.

Significantly, however, the Chinese Producers have adduced no evidence whatsoever to support their premise that provident fund expenses are akin to "bonuses and gratuities and housing and family allowances" – much less to establish that provident fund expenses are "paid by the employer directly to [the] employee" (language that the Chinese Producers' Reply Brief conveniently omitted in quoting the definition of "earnings"). *See* Pls.' Reply Brief at 14 (emphasis

---

[61]The statute provides that, for purposes of determining export price or normal value, and in conducting reviews, Commerce may "decline to take into account adjustments which are insignificant in relation to the price or value of the merchandise." 19 U.S.C. § 1677f-1(a)(2).

[62]The Chinese Producers are quite vague on the asserted relationship between provident fund expenses and "bonuses and gratuities and housing and family allowances." At one point in their brief, the Chinese Producers assert that "'provident fund' expenses . . . are costs similar to gratuities." *See* Pls.' Brief at 56. Elsewhere, they assert that "gratuities and staff welfare benefits" are "labor expenses (generally itemized as gratuities and provident funds in the Indian financial statements)." *See* Pls.' Brief at 52. (It is clear, however, that "staff welfare" expenses are distinct from "gratuities" and "provident fund" expenses. And it is equally clear that staff welfare expenses are not at issue in this action. *See* n.60, *supra*.)

omitted).[63]  Indeed, quite to the contrary, the Final Results explain that provident fund expenses are

analogous to "employee benefits such as pension and social security," which are expressly excluded

from the ILO Yearbook definition of "earnings" quoted in the Final Results.[64]  *See* Decision

Memorandum at 72; *see also* Def.'s Brief at 51 (analogizing provident fund expenses to "retirement"

and "401K plans, etc."); Tables and Chairs from the PRC, 2006 WL 158633, at comment 1B

(explaining that "employees' provident and other funds," *inter alia*, are "employee benefits paid by

the employer to employee retirement or welfare funds").[65]

---

[63]As noted above, the Chinese Producers rely upon the definition of "earnings" set forth in the Preamble to Chapter 5 of the ILO Yearbook, which indicates that "Earnings should include . . . bonuses and gratuities and housing and family allowances paid by the employer directly to [the] employee."  *See* ILO Yearbook, Preamble to Chapter 5.  Subparagraph (c) of that definition further explains: "Bonuses and gratuities cover seasonal and end-of-year bonuses, additional payments in respect of vacation period (supplementary to normal pay) and profit-sharing bonuses."  *Id.*  Nothing in the language of these provisions suggests that provident fund expenses are included within the concept of "earnings."

At one point in their brief, the Chinese Producers assert that "'provident fund' expenses . . . are costs similar to gratuities."  *See* Pls.' Brief at 56.  But that claim finds no support in the evidentiary record.

[64]As noted above, Commerce explained in the Final Results that ILO Yearbook Chapter 5, entitled "Wages," expressly defines "earnings" (as that term is used in wage statistics) to specifically exclude benefits such as "social security and pension scheme[]" payments and benefits:

> The concept of earnings, as applied in wages statistics, . . . exclude[s] employers' contributions in respect of their employees paid to social security and pension schemes and also the benefits received by employees under these schemes.

Decision Memorandum at 71 (*quoting* ILO Yearbook, Chapter 5).

[65]The definition of "earnings" that the Chinese Producers quote (taken from the Preamble to Chapter 5 of the ILO Yearbook) is not to the contrary.  There is absolutely nothing to suggest that "earnings" – even as defined there – include "employee benefits such as pension and social security" (or "retirement and 401K plans," or "employee benefits paid by the employer to employee retirement or welfare funds").  In other words, there is simply no language in the definition of

In short, contrary to the Chinese Producers' implications, the record here is devoid of evidence to suggest that provident fund expenses are like "bonuses and gratuities and housing and family allowances," or that provident fund expenses are payments paid by the employer directly to the employee. Nor is there record evidence to indicate that provident fund expenses are otherwise included within "earnings." The Chinese Producers' claim that Commerce's labor rate calculations already reflect provident fund expenses is thus entirely lacking in substance.

The Chinese Producers' allegations concerning the "double counting" of gratuity expenses are equally lacking in merit. As detailed more fully above, Commerce's Final Results expressly recognized the possibility of double counting vis-a-vis certain gratuity expenses in this case. *See* Decision Memorandum at 72. However, Commerce determined that – even as to the two financial statements where there was a potential for double counting – the exclusion of gratuities from overhead resulted at most "in a one hundredth of a percent change in the overhead ratios" for those financial statements, and made *no difference whatsoever* "in the overall calculation of the overhead ratio." *See* Decision Memorandum at 72-73. The Chinese Producers do not contend otherwise, and therefore cannot be heard to complain. *See generally* Pls.' Brief at 53-54; Pls.' Reply Brief at 13-15.

The Chinese Producers also attack the Final Results as "internally inconsistent." *See generally* Pls.' Brief at 56. Noting that Commerce acknowledged the potential for double counting vis-a-vis gratuities, the Chinese Producers state that Commerce "inexplicably" included provident fund expenses as part of overhead, even though – according to the Chinese Producers – "'provident

_____

"earnings" quoted by the Chinese Producers that would suggest that provident fund expenses are included in "earnings" (and, thus, already reflected in the surrogate labor rate).

fund' expenses . . . are costs similar to gratuities." *Id*. The Chinese Producers insist that "[t]hese two positions cannot be reconciled. [Commerce's] inclusion of both provident fund and gratuities as part of overhead results in impermissible double-counting for exactly the same reason, namely because these two labor related expenses are already captured by the surrogate labor rate." *Id*. The folly of the Chinese Producers' premise is exposed above: Contrary to the Chinese Producers' claims, provident fund expenses *are not* "similar to gratuities."

Finally, citing Luoyang Bearing, the Chinese Producers argue that Commerce's treatment of provident fund and gratuity expenses in this case "runs contrary to agency and Court precedent." *See* Pls.' Brief at 53, 55-56 (*citing* Luoyang Bearing Corp. v. United States, 28 CIT 733, 753, 347 F. Supp. 2d 1326, 1346 (2004)); *but see* Def.'s Brief at 53. However, the Chinese Producers' reliance on Luoyang Bearing is misplaced. Among other things, that case was decided before Commerce's change in methodology, first announced in Tables and Chairs from the PRC and implemented in this case. And it is beyond cavil that Commerce is entitled to change its methodology, provided that any such change is fully explained and adequately justified (as it was in this case). *See*, *e.g.*, NSK Ltd. v. United States, 510 F.3d 1375, 1381 (Fed. Cir. 2007).

In sum, the Chinese Producers have pointed to nothing that substantiates their claim that provident fund expenses were already reflected in Commerce's calculations (through the surrogate labor rate), such that those expenses should not have been separately accounted for in manufacturing overhead. Further, it is clear from the record that any potential double counting associated with Commerce's treatment of gratuities had no effect whatsoever on the overall calculation of overhead expenses. The Chinese Producers' challenge to Commerce's treatment of provident fund and

gratuity expenses is thus lacking in merit, and Commerce's determination on the issue must be sustained.

### IV.  Conclusion

For all the reasons set forth above, the Chinese Producers' Motion for Judgment on the Agency Record must be denied as to Commerce's use of an intermediate input methodology in valuing fresh garlic bulb.  The Chinese Producers' Motion for Judgment on the Agency Record similarly must be denied as to the Chinese Producers' claim that Commerce improperly included provident fund and gratuity expenses as part of manufacturing overhead.

On the other hand, the Chinese Producers' Motion for Judgment on the Agency Record is granted as to the Chinese Producers' challenge to Commerce's use of the Agmarknet data for "China" variety garlic to value fresh garlic bulb, as well as the Chinese Producers' challenges to Commerce's wage rate calculation, Commerce's valuation of ocean freight, Commerce's valuation of packing cartons, and Commerce's valuation of plastic jars; and this matter is remanded to the Department of Commerce for further action not inconsistent with this opinion.

A separate order will enter accordingly.

/s/ Delissa A. Ridgway
_____
Delissa A. Ridgway
Judge

Dated:  May 13, 2009
       New York, New York